## Commonwealth *vs.* Jean Claude Jules.

Plymouth. November 9, 2012. - March 7, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, & Gants, JJ.

*Homicide. Practice, Criminal,* Motion to suppress, New trial, Admissions and confessions, Voluntariness of confession, Interpreter, Waiver, Assistance of counsel, Witness, Capital case. *Constitutional Law,* Voluntariness of statement, Assistance of counsel, Witness, Admissions and confessions, Identification. *Due Process of Law. Waiver. Interpreter. Identification. Witness.*

No substantial likelihood of a miscarriage of justice arose from the absence of a recording of a murder defendant's interview with police and a translator, where the judge properly concluded that the defendant knowingly, willingly, and intelligently waived his Miranda rights, and that his statements were otherwise voluntarily made, in that there was no clear error in the judge's findings that the translator properly and completely advised the defendant of his rights in Haitian-Creole, that the translator was able to discern what the defendant said, and that what the defendant said reflected his understanding of the Miranda warnings. [486-488]

At a murder trial, counsel's failure to move to suppress a witness's identification of the defendant did not constitute ineffective assistance, where the defendant did not demonstrate a likelihood that such a motion would have been successful, in that there was no showing that the witness's memory of her original observations of the defendant was impaired, and the so-called "suggestive" confrontation with a newspaper photograph of the defendant occurred only two days after her original observations of him. [489-491]

Indictment found and returned in the Superior Court Department on July 3, 2003.

A pretrial motion to suppress evidence was heard by *Joseph M. Walker, III,* J.; the case was tried before *Richard J. Chin,* J., and a motion for a new trial, filed on April 13, 2010, was heard by him.

*Stephen Paul Maidman* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

Ireland, C.J. On February 16, 2007, a jury convicted the

defendant, Jean Claude Jules, of murder in the first degree on the theory of extreme atrocity or cruelty.[1] Represented by new counsel on appeal, the defendant argues error in the denial of his motion to suppress statements and motion for a new trial.[2] He also seeks relief pursuant to G. L. c. 278, § 33E. We affirm the defendant's conviction and the denial of his motion for a new trial, and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Facts.* Based on the Commonwealth's evidence, the jury could have found the following. The defendant and the victim lived together in the victim's apartment in Brockton. They both were from Haiti,[3] and the defendant planned to marry the victim and remain in the United States. The victim, however, wanted to end their relationship. She informed a friend from work that she was buying a new house and was not taking the defendant with her.

During the week prior to her death, the victim and the defendant argued. On Wednesday, June 11, 2003, the defendant "caught" the victim on the telephone with "somebody." The defendant told a friend that he believed that the victim was "having an affair." The victim told the defendant that he needed to move out of her apartment and, if he did not, she would move and leave him there. The two argued throughout the day, and the victim threw a key or keys at the defendant. The defendant told a friend that the victim was "not going to do this to [him] anymore." He quietly said to the victim, "You're going to stop doing that, you're not going to do that anymore." The defendant stayed at the victim's apartment for the rest of the week; the victim stayed at a friend's house.

On Saturday morning, June 14, the defendant went to see the victim at her friend's home. The victim told him that she was not going to marry him. The defendant replied, "You're never going to have someone else again, you're not going to have another husband." After the victim left, the defendant told the

---

[1] The Commonwealth also had proceeded under a theory of deliberate premeditation, but the jury did not find the defendant guilty under that theory.

[2] The defendant's appeal from the order denying his motion for a new trial was consolidated with his direct appeal.

[3] The defendant spoke very limited English.

victim's friend that he (referring to himself) was going to need her prayers.

The victim stayed with her friend on Saturday night. She left for work on Sunday, June 15, at about 2:30 P.M.[4] The victim telephoned her friend around 11 P.M., as she was getting out of work, and asked whether the defendant was there. Learning that he was, the victim said she would not return and would not be giving the defendant a ride anywhere.[5] A friend of both the victim and the defendant, Pierre Daniel Pierre St. Laurent, gave the defendant a ride back to the victim's apartment. When he dropped off the defendant, the victim's automobile was not in the driveway.

Sometime after 11 P.M. the victim stopped by a coworker's house. She stated that she was on her way home and announced that she was leaving the defendant.[6] Around this time, the defendant telephoned the victim's friend to see where the victim was. When the victim's friend's daughter relayed that the victim was on her way home, the defendant accused her of lying. Thereafter, the victim telephoned her friend's house, stated that she was home, and said something about packing. She indicated that the defendant was there sleeping. She said that she was going to take a few things and leave.

The next morning, Monday, June 16, at 6:30 A.M., the defendant telephoned the victim's friend and asked about the whereabouts of the victim. He told the victim's friend, "If she didn't sleep at your house last night, she's dead."

Sometime in the early morning of June 16, the defendant went to St. Laurent's house looking for his cellular telephone. St. Laurent suggested that the defendant should get some sleep and put him in a bedroom. He awakened the defendant at 11:30 A.M. and drove the defendant back to the victim's apartment because the defendant stated he had laundry to do. The defendant informed St. Laurent that the victim had not come home the previous night.

---

[4]The victim worked at a hospital in Braintree. She often would work the 3 P.M. to 11 P.M. shift.

[5]The defendant did not have a driver's license.

[6]The victim's coworker had hired the defendant to do some work around her house.

After doing some personal errands, St. Laurent returned to the victim's apartment. He made himself a sandwich while the defendant was in the bathroom for about forty-five minutes. A scent of a cleaning agent permeated the air. St. Laurent took the defendant to a nearby laundry facility to pick up blankets. Thereafter, at 5 P.M., he took the defendant to the house of one of the victim's coworkers, where the defendant was doing some work. Inside, the defendant told the victim's coworker that he had not seen the victim. He expressed his opinion that the victim would have been a "good preacher," but "she [had] ruined her life." The defendant left about twenty minutes later.

Once outside, he asked St. Laurent to take him to the hospital where the victim worked. When they were two blocks away, they encountered a road block and turned around. The men went to a house in Brockton to do some work. While there, St. Laurent suggested that the defendant take a "break" from the victim. The defendant replied, "I don't have to worry about that no more because the [victim] thing is over."

This same day, at 4:20 P.M., police found the victim's body inside her automobile which had been parked oddly on the side of a road near the hospital where she worked. The police officer who discovered the victim observed multiple wounds to her hands, head, and neck. The officer attempted to check for a pulse, but the victim's body was stiff to the touch.

The victim's automobile had been seen earlier at that location, at approximately 4:10 A.M. At about 5 A.M., a woman delivering newspapers had seen a man, whom she later identified as the defendant, walking southbound on that street.

Police quickly ascertained the victim's identity by determining who owned the automobile in which she was found and by asking a supervisor at the hospital to identify her body (the victim had been wearing "scrub[s]" and a visit to the hospital confirmed that she was an employee). They also immediately suspected, by the absence of a significant amount of blood inside the automobile, that the victim had been killed elsewhere. Shortly thereafter, four law enforcement officers went to a house in Brockton looking for the defendant. They found him there, as well as St. Laurent.

Through St. Laurent, a State trooper asked both St. Laurent

and the defendant to go to the Brockton police station because they had learned that the defendant's girl friend was "missing" and they had some questions. The men agreed.

At the station, the men were separated. The defendant was not restrained and waited in a training room for a translator who spoke fluent Haitian-Creole to arrive. The interview of the defendant, through the translator, was not recorded.[7] The evidence at trial concerning the procedures followed during the interview was substantially similar to that established at the hearing on the motion to suppress and does not bear repeating (a discussion concerning the defendant's suppression motion follows). After first stating that the victim had never come home after work on Saturday night and denying having been near the hospital where the victim worked on Sunday night or Monday morning, the defendant eventually relayed that he had been merely defending himself against the victim. The defendant stated that, after working, the victim returned to her apartment and was upset that he was there. She attacked him with a knife and ended up stabbing herself while he "protected himself from the knife." The defendant then drove the victim to the hospital where she worked,[8] but became afraid so he pulled over to the side of the road and left her there. The defendant stated that the victim had not died in the apartment. He also stated that he had discarded his clothing at a garbage container near the victim's apartment.[9]

The police investigation of the victim's apartment showed no signs of forced entry. The mattress in the victim's bedroom had been turned over and was soaked with blood. Blood spatter was found on the headboard of the bed and on a wall in the room. Chemical analysis revealed the presence of additional blood on

---

[7]The interview occurred before this court decided Commonwealth v. Di-Giambattista, 442 Mass. 423, 447 (2004), which concerned the significance of the failure to preserve an interrogation conducted at a place of detention by means of an electronic recording. However, we note that, because the case was tried after the DiGiambattista case, the judge properly instructed the jury in accordance with the DiGiambattista decision. See id. at 449 (stating no "need to postpone the implementation of our decision").

[8]Initially, the defendant claimed that the victim was the one to drive the automobile to the hospital.

[9]Police recovered the clothing and later, after giving the defendant Miranda warnings, showed him a shirt that had been recovered. The defendant admitted that the shirt belonged to him.

the bedroom wall. Cleaning agents, as well as wet clothes, were discovered in the bathroom. A bloodstain was on the handle to the refrigerator. Two knives were recovered: one that was wet in the sink and the other in the trash.[10] The knife recovered from the sink tested negative for the presence of blood; the other knife tested positive for the presence of blood. Deoxyribonucleic acid (DNA) testing revealed blood consistent with that of the victim and the defendant under the fingernails of the victim's right hand, and blood consistent with that of the defendant and an unknown person on the right forearm of the victim. Otherwise, the testing results did not inculpate the defendant.[11]

There were no tears or cuts to the outer garments worn by the victim. The victim's undergarments tested positive for the presence of blood and were inside out, and there was a tear along the seam of one of the undergarments.

The victim died as a result of multiple stab wounds. She had approximately seventy stab wounds on her body, concentrated at her head, neck, chest, abdomen, and upper extremities. There was evidence of defensive wounds and there were bite marks on her left arm. The medical examiner testified that none of her injuries would have rendered her immediately unconscious.

2. *Motion to suppress.* Prior to trial, the defendant moved to suppress statements he made to police on June 16, 2003, when he and St. Laurent agreed to speak with police at the Brockton

---

[10]After giving the defendant the Miranda warnings, police showed the defendant a photograph of the knife recovered from the sink, and he indicated that it was the knife used.

[11]The statistical significance of the deoxyribonucleic acid (DNA) testing was not presented to the jury. See *Commonwealth* v. *Ortiz*, 463 Mass. 402, 408 & n.10 (2012), citing *Commonwealth* v. *Lanigan*, 419 Mass. 15, 20 (1994) (evidence of DNA "match" is meaningless without evidence indicating significance of match). This was error. *Commonwealth* v. *Mattei*, 455 Mass. 840, 851-855 (2010). The defendant did not object to the admission of this testimony. Because the defendant was the victim's boy friend, the omission was of limited significance. See *Commonwealth* v. *Linton*, 456 Mass. 534, 559-560 (2010) (admission of nonexclusion DNA evidence without qualifying statistical evidence did not result in substantial likelihood of a miscarriage of justice where defendant was victim's husband). In view of this factor, the defendant's own statements to police, the medical examiner's findings concerning the nature and extent of the victim's injuries, and defense counsel's use of the DNA evidence to argue the significance of nonmatching DNA in the case, we conclude that no substantial likelihood of a miscarriage of justice occurred.

police department. The defendant claimed that his statements were made in violation of *Miranda* v. *Arizona,* 384 U.S. 436 (1966), and were not made freely and voluntarily under the totality of the circumstances. He asserted that: (1) his inability to speak the English language impaired his ability to resist talking to police; (2) his refusal to sign the Miranda waiver form precludes a finding that he thereafter waived those enumerated rights; (3) the discussion was completely involuntary and he made statements without the comprehension of the possible consequences; and (4) any notion of ending the questioning was eroded as the interview lengthened. Following an evidentiary hearing, a judge who was not the trial judge denied the motion.

We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing. See *Commonwealth* v. *Garcia,* 443 Mass. 824, 828 (2005). After police located the defendant, he and St. Laurent agreed to go to the Brockton police station to speak with them. The defendant was not handcuffed or otherwise restrained. On arrival, the defendant was escorted to a large conference room on the second floor and was seated at a large table. The defendant did not slur his speech, did not have difficulty walking, and did not exhibit any signs of being impaired by alcohol or drugs. The ensuing interview was not recorded.

Police officers had asked a woman who worked at the Brockton police department as a 911 dispatcher to translate for them and the defendant during the interview. The translator spoke fluent Haitian-Creole and had previously translated for the officers when needed. In addition to the translator, State Trooper Brian Brooks, Braintree police Lieutenant Russell Jenkins, and Brockton police Detective Dominic Persampieri were present during the interview. Trooper Brooks led the interview, asking questions in a calm, composed manner.

Trooper Brooks produced a preprinted Miranda waiver form and asked the translator to interpret word for word its content to the defendant. After the translator did so,[12] the defendant asked, "Why all this?" and "Why should I sign this?" He added, "I

---

[12]During the course of the interview, the translator was impressed that the defendant appeared to be an educated individual, did not express any confusion, and seemed to comprehend and respond appropriately to the questions posed.

have nothing to hide." The defendant indicated that he did not want to sign the form. After noting that the defendant refused to sign the form, Trooper Brooks and Detective Jenkins signed the form, recording the time as 8:40 P.M.

Although the defendant did not sign the waiver form, he agreed to speak with the officers and did not ask to leave or request the assistance of an attorney. He appeared calm and continued with the conversation through the use of the translator.

Through the translator, Trooper Brooks asked the defendant to recount his activities during the previous Saturday and Sunday. After about forty minutes into the interview, a break was taken, whereupon the officers left the room to learn additional information about the ongoing investigation. During this and a later break, the defendant was provided with water and food.

During the interview, Trooper Brooks eventually informed the defendant that the victim was dead. The defendant showed no reaction and asked no questions about the circumstances of her death. He admitted that he and the victim had argued earlier in the week and that the victim may have been dating someone else.

Through the translator, the defendant was presented with various forms that were read to him whereby he consented to a search of the victim's apartment and to having his hands swabbed to search for blood. The defendant voiced no objection to these forms and appeared to understand their terms. While the defendant's hands were being swabbed by the technician, the defendant stated that he had suffered a cut on his hands while working. He also indicated that, if blood were to be found on his hands, it was there because he had washed the victim's underwear, which he described as bloody due to her menstruation.

After the defendant was informed that his hands had tested positive for the presence of blood and that the police knew that the victim had been at her apartment in the early Monday morning hours, the defendant indicated that he believed that the police were "bluffing." He added that the victim had threatened to commit suicide and blame him for it. After Trooper Brooks relayed that there was no possibility that the victim had committed suicide, the defendant asked what Trooper Brooks could do for him. Trooper Brooks indicated that he could make no promises, that he was not the district attorney, and that the only

thing the defendant could do to help himself was to tell the truth. The defendant stated that the victim had attacked him with a knife, and that he had defended himself. He provided other incriminating information. At about 2 A.M., the defendant was placed under arrest.

The judge found that the translator had "properly and completely advised" the defendant of his Miranda rights in Haitian-Creole, and that the defendant did, in fact, understand them. The defendant's reluctance to sign the preprinted Miranda waiver form demonstrated his understanding of the rights described therein and "his lucid consideration of his options." The judge rejected the defendant's arguments that a language barrier adversely affected his ability to understand the Miranda warnings, and that his refusal to sign the Miranda form precluded a finding of a valid waiver of Miranda rights. See *Commonwealth v. Ortiz*, 435 Mass. 569, 577 (2002) (absence of written waiver of Miranda rights does not vitiate oral waiver). The judge concluded that the Commonwealth satisfied its burden of proving beyond a reasonable doubt both the knowing, willing, and intelligent waiver of Miranda rights by the defendant, and the voluntariness of his statements. See *Commonwealth v. Day*, 387 Mass. 915, 921 (1983).

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" *Commonwealth v. Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth v. Jimenez*, 438 Mass. 213, 218 (2002). The defendant argues on appeal that, because there was no recording of his interview with police and the translator, there is no reliable evidence of the linguistic adequacy of the translated Miranda warnings and no verification of what the defendant said in response to the translator to verify that he understood the warnings. Consequently, he argues, the motion judge improperly denied his motion to suppress and incorrectly concluded that the Commonwealth satisfied its burden of proving beyond a reasonable doubt that he made a knowing, willing, and intelligent waiver of his Miranda rights, and that his statements were otherwise voluntarily made. Because the defendant did not raise this claim below, we ordinarily would not consider

it. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987), and cases cited. Pursuant to our review under G. L. C. 278, § 33E, however, we conclude that no substantial likelihood of a miscarriage of justice arose from the absence of a recording of the interview.

The record belies the defendant's claim that, in the absence of a recording of the interview, the linguistic adequacy of the translated Miranda warnings is unreliable.[13] The record establishes that the translator was born in Haiti, grew up speaking Haitian-Creole, continued speaking it with her family, and was fluent in it. There is no evidence that anything particular about the Haitian culture or language would have made it difficult for the defendant to understand the translator. The record established, without contradiction, that the translator had provided translation services for the Brockton police department on prior occasions. Based on the record before him, the judge's finding that the translator properly and completely advised the defendant of his rights in Haitian-Creole was not clearly erroneous and should not be disturbed.

The absence of a recording of the defendant's responses to the translator does not give rise to a substantial likelihood of a miscarriage of justice. From the judge's findings, it is clear that he credited the translator's testimony concerning what the defendant said to her and properly concluded, based on his credibility determinations, that she was able to discern what the defendant said, and that what he said reflected his understanding of the Miranda warnings. In the circumstances, we discern no reason to disturb the judge's determinations that, on the record before him, are not clearly erroneous. We conclude that no substantial likelihood of a miscarriage of justice arises from the absence of a recording of the interview in this case. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 539 (1990). There was no error in denying the defendant's motion to suppress on this ground. The absence of a recording does not require the exclusion of statements, but rather is a factor for the jury to consider when they decide whether the Commonwealth proved the voluntariness of the defendant's statements. See *Commonwealth* v. *DiGiambat-*

---

[13]The defendant does not argue that the interview was required to be recorded at the time it took place, in 2003. See note 7, *supra.*

*tista*, 442 Mass. 423, 447-448 (2004). Because the defendant's argument concerning the voluntariness of his statements is predicated on his argument concerning the waiver of his Miranda rights, the argument similarly fails.

3. *Ineffective assistance of trial counsel.* At trial a witness testified that, at about 5 A.M. on the day the victim's body was discovered by police, she was delivering newspapers and saw a man, whom she later identified as the defendant, walking near the location where the victim was found. Because the witness found it unusual to "see somebody on that road" at that time, she mentioned the sighting to her husband when she returned from her route. Two days later, the witness's husband asked whether she had seen the newspaper.[14] The witness had not, but took a look and recognized a photograph of the defendant on the front page as the man she had seen previously.[15] She immediately remarked to her husband, "Oh my God, that's the man that I saw." She contacted police.[16,17] During the witness's cross-examination, defense counsel elicited testimony concerning the short span of time in which she actually had observed the defendant and the fact that she had made her observations before dawn. When asked whether she had observed a caption over the story, the witness stated, "I don't remember seeing any words on — I'm sure there was a caption, but don't remember ever reading it."

Following his conviction, the defendant, through new counsel, moved for a new trial under the Federal and State Constitutions on the ground that his trial counsel provided ineffective assistance by failing to file a pretrial motion to suppress the witness's identification of the defendant.[18] The defendant asserted that, although not attributable to the Commonwealth, the

[14]The newspaper to which he was referring was not the one she delivered.

[15]The photograph was not admitted as evidence at trial, but is contained in the record appendix. The defendant appears in handcuffs and above the photograph the caption reads, "A brutal, horrific murder." In much smaller print below the photograph, the text reads, "Jean Claude Jules of Brockton is arraigned in Brockton District Court yesterday for the vicious stabbing slaying of [the victim]. Story, Page 5."

[16]The witness made an in-court identification of the defendant.

[17]The witness's grand jury testimony in relevant part mirrored her trial testimony.

[18]The defendant's trial counsel submitted an affidavit with the motion that

witness's identification of him was a "highly suggestive confrontation" because the photograph was "outrageously suggestive." The trial judge noted that the witness's exposure to the defendant's photograph in the newspaper was not "a result of any conduct on the part of the police or the Commonwealth" and concluded that it "was not a sufficient ground to suppress [the] identification." The judge added that defense counsel's cross-examination of the witness at trial "was more than sufficient to explore the reliability of [her] identification." For these reasons, the judge denied the motion.

When a defendant claims ineffective assistance of counsel for failure to move to suppress, he must "demonstrate a likelihood that the motion to suppress would have been successful." *Commonwealth* v. *Walker*, 460 Mass. 590, 599 (2011), quoting *Commonwealth* v. *Comita*, 441 Mass. 86, 91 (2004). "Under art. 12 of the Massachusetts Declaration of Rights, an out-of-court eyewitness identification is not admissible where the defendant proves by a preponderance of the evidence, considering the totality of the circumstances, that the identification is so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process."[19] *Commonwealth* v. *Walker*, *supra*, and cases cited. "If police have not in any way manipulated press reports, then simple exposure to the media is not sufficient ground to suppress an identification [on constitutional grounds]." *Commonwealth* v. *Horton*, 434 Mass. 823, 835 (2001), quoting *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 542 (1990).

The defendant claims that the judge erred in analyzing his motion for a new trial by failing to consider the exclusion of the identification evidence based on common-law principles set forth in *Commonwealth* v. *Jones*, 423 Mass. 99 (1996). In that

summarized the witness's grand jury testimony (which was separately submitted to the judge) and stated that he (trial counsel) had "no legitimate strategic reason not to have filed a motion to suppress [the witness's] identification."

[19]Regarding the question of admissibility where a defendant satisfies his burden, a different analysis is applied under the United States Constitution. See *Commonwealth* v. *Walker*, 460 Mass. 590, 599 n.13 (2011). Because the standard for the admissibility of identification evidence under the Massachusetts Constitution is more favorable to a defendant than the standard under the United States Constitution, we need only review the defendant's arguments pursuant to our State standard. See *id.*

case, we recognized that common-law principles of fairness dictate that an unreliable identification arising from "especially suggestive circumstances" should not be admitted in evidence even where the police were not responsible for the suggestive confrontation. *Id.* at 108-109. See *Commonwealth* v. *Odware*, 429 Mass. 231, 236 (1999) ("in some circumstances an identification that has been tainted, but not by the government, may become so unreliable that its introduction into evidence is unfair"). However, in *Commonwealth* v. *Jones*, *supra*, the witness's original brief encounter with the defendant took place a few months prior to the "highly suggestive" encounters with the defendant, who then was in custody in a court room. *Id.* at 101-102, 105, 110. Consequently, the judge could not find by "clear and convincing evidence" that the witness's in-court identification was based on her original observations of the defendant.[20] *Id.* at 105. We agreed based on the circumstances of that case. *Id.*

Here, there was no showing that the witness's memory of her original observations of the defendant was impaired, and the so-called "suggestive" confrontation with the newspaper photograph occurred only two days after her original observations of the defendant. While we agree with the defendant that determinations under the common law regarding the admissibility of pretrial out-of-court identifications do not turn solely on whether government agents were involved in the identification, we find the facts of this case to be distinguishable from those in *Commonwealth* v. *Jones*, *supra*.

The defendant contends that the witness's identification of him from the newspaper photograph was "highly suggestive." In support of his argument, he relies on the text appearing in the captions above and below the photograph, as well as the accompanying story. The witness, however, was cross-examined at trial concerning this issue and testified that she did not recall seeing any of the words comprising the captions and did not recall reading any caption, or any story for that matter, before making the identification. On the record before us, there was no error in the admission of the witness's identification testimony,

---

[20]In *Commonwealth* v. *Jones*, 423 Mass. 99 (1996), the defendant challenged an in-court identification, not a pretrial out-of-court identification.

and "[t]he jury were capable of making an informed assessment of the accuracy of [the witness's] identification and assessing its weight, aided by . . . cross-examination and the judge's instructions [on evaluating eyewitness identification testimony]." *Commonwealth* v. *Walker, supra* at 606-607. Because the defendant has not demonstrated a likelihood that a motion to suppress this evidence would have been successful, we conclude that the judge did not err in denying his motion for a new trial.

4. *G. L. c. 278, § 33E.* There is no basis for relief pursuant to G. L. c. 278, § 33E.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*