NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-778

COMMONWEALTH

vs.

JOSE RODRIGUEZ.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury found the defendant guilty of armed assault with intent to murder, assault by means of a dangerous weapon (ADW), unlawful possession of a firearm, unlawful possession of ammunition, and malicious destruction of property.[1] The underlying convictions were based on evidence that the defendant fired multiple shots into a residence in Springfield. We conclude that the evidence was sufficient to sustain the defendant's convictions, and that there was no error in the admission of evidence regarding a witness's pretrial identifications of the defendant.  However, we also conclude

_____

[1] Based on the defendant's criminal record -- which was established in a separate jury-waived trial -- the judge applied various enhancements at sentencing.

that it was error for the trial judge to allow a witness to identify the defendant in court, and that this requires vacating of the defendant's convictions.[2]

1. Sufficiency. The defendant challenges the sufficiency of the Commonwealth's proof in two respects, which we consider in turn. In assessing the sufficiency of the evidence, we are to view the Commonwealth's evidence -- including all reasonable inferences therefrom -- in the light most favorable to the Commonwealth. See Commonwealth v. Latimore 378 Mass. 671, 677 (1978). The ultimate question is whether the evidence viewed in that light was sufficient to persuade any rational fact finder that the essential elements of the offenses charged had been established beyond a reasonable doubt. Id. at 677-678. "Our consideration 'is to be measured upon that which was admitted in evidence without regard to the propriety of the admission.'"

---

[2] The defendant makes two additional arguments. One is that the trial judge did not adequately address whether the jury were influenced by extraneous matters (their alleged fear of the defendant and his family). The other is that the convictions of illegal possession of a firearm and ammunition must be vacated because the jury were not instructed that the lack of a license were elements of the offenses (an error that the Commonwealth concedes while claiming that there was no prejudice). See Commonwealth v. Guardado, 491 Mass. 666, 690 (2023) (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II). We need not reach these issues. We acknowledge as to the possessory offenses that although the evidence may have been "insufficient . . . when viewed through the lens of a legal development that occurred after trial," double jeopardy principles do not bar a retrial. See Guardado II, supra at 7.

Commonwealth v. Sepheus, 468 Mass. 160, 164 (2014), quoting Commonwealth v. Farnsworth, 76 Mass. App. Ct. 87, 98 (2010).

a. Background. We begin by summarizing the trial evidence. Feleisha Thompson lived in a house in Springfield, which she shared with her twin sister. The sister's boyfriend, Jose Fargas, who also went by the nickname Cuavo,[3] sometimes stayed there as well. On the night of April 11, 2017, Fargas hosted a party at the house, in the nature of a "cookout." The party, which lasted approximately from noon to midnight, was attended by Fargas, his girlfriend, Thompson, Thompson's six year old son Matthew (a pseudonym), and approximately four of Fargas's friends. According to Thompson, the defendant was not one of the four guests, but he came to the party late that evening to pick someone up. He was wearing light blue jeans, a red plaid flannel shirt over a white T-shirt, and a hat.

Over the course of the party, Fargas drank to excess. At one point, close to midnight, he became bellicose, based apparently on his belief that a male attendee at the party (not the defendant and perhaps someone named Lance) was flirting with his girlfriend. A loud verbal altercation ensued. Fargas's

---

[3] The trial transcripts spell the name phonetically with a "Q," but the witness at the motion to suppress hearing testified that the name is spelled with a "C." Nothing turns on the spelling.

3

girlfriend urged him to go to bed, which he did.[4]  The partygoers recognized it was time to leave and dispersed.  Meanwhile, Matthew (Thompson's son), was sleeping in an upstairs bedroom.

Shortly thereafter, a man approached Thompson's house and walked directly by her as she was outside in the driveway moving her car.  The man, whom Thompson later identified as the defendant, was wearing light jeans, a white T-shirt (without any outer shirt) and no hat.  After demanding to know "where's Cuavo?" the man proceeded to the back of the house and, still outside, started firing into multiple rooms as he continued to walk around it.  The bullets did various damage to the house, and one lodged in the living room ceiling, which was under the second-floor bedroom in which Matthew was sleeping.  At this point, Fargas was resting in a different bedroom, but the shots caused him to wake up.  Alerted both by 911 calls and by a "shot spotter" alert system, the police responded, but the shooter had fled.

Although Thompson recognized the shooter as someone she had seen at the party, she had not seen him before that night and

---

[4] At trial, the defendant sought to make much of the fact that before going to bed, Fargas initially left, and then came back after two minutes to argue some more.  The suggested implication seems to be that he might have gone to arm himself. It is not entirely clear how this would have assisted the defendant's defense, but in any event for purposes of our sufficiency analysis, it has no import.

4

did not know his name.  She found a photograph of him on Facebook on an account associated with someone who went by the name "Joey Crack."  Thompson provided that information to the police.  The police in turn put together an array of eight photographs of similarly-looking individuals, which were shown to Thompson serially.  Included within the array was a photograph of the defendant that Thompson identified as being that of the shooter.  When asked at that time how sure she was, she stated ninety percent.  Over the defendant's objections, Thompson also identified the defendant as the shooter at trial.[5]

The defendant's former girlfriend provided corroborating testimonial evidence that the defendant was the shooter.  According to her, the defendant admitted to her that after attending a friend's house in Springfield, "something happened between him and . . . the person that stayed there," and "he did shoot up the house."  She specifically testified that the defendant told her that he had shot into the house from multiple angles.[6]

_____

[5] Further details regarding the pretrial and trial identifications, and the defendant's efforts to exclude them, are reserved for further discussion below.

[6] Defense counsel sought to impeach the former girlfriend's testimony as biased, for example, by pointing out that she was in a child support and custody battle with the defendant. Because the jury were not required to view her as biased, the defendant's impeachment efforts have no bearing on our review of the sufficiency of the evidence.

b. Discussion. i. Assault. The armed assault with intent to murder and ADW convictions both depend on proof that the defendant committed an assault. An assault in turn can be committed in either of two ways: a threatened battery and an attempted battery. See Commonwealth v. Andrade, 488 Mass. 522, 543 (2021). The jury here were instructed as to both theories, and they returned a general verdict on the two assault-related offenses without specifying which theory they accepted. The defendant argues, and the Commonwealth appropriately concedes, that there was insufficient evidence that he committed a threatened battery.[7] Based on this, the defendant further argues that because the jury rendered a general verdict (and we hence do not know which of the two theories the jury accepted), the assault-related convictions must be vacated regardless of whether there was sufficient evidence that he committed an attempted battery. See Commonwealth v. Chambers, 57 Mass. App. Ct. 47, 51-52 (2003). This argument fails, however, because the Supreme Judicial Court abrogated the holding of Chambers in Andrade, supra at 544 ("Because the jury need not have indicated, and did not indicate, which theory they found, contrary to the defendant's assertion, we need go no further in

---

[7] The indictments alleged that the assaults were committed against Matthew. There was no evidence that Matthew ever awoke during the shooting.

determining that the evidence was sufficient to establish an immediately threatened battery").

We turn then to whether there was sufficient evidence that the defendant committed an attempted battery. The indictments alleged that the person the defendant assaulted was Matthew. Although there was no evidence that the defendant intended to commit a battery on Matthew, there was evidence that he intended to commit a battery on Fargas, and his intent to do so can be transferred to Matthew. See Commonwealth v. Melton, 436 Mass. 291, 296-299 (2002). The remaining issue is whether there was sufficient evidence that he came "reasonably close" to striking Matthew with a bullet. See Andrade, 488 Mass. at 543. We agree with the Commonwealth that it satisfied that requirement by evidence that the defendant fired a shot in the direction of where Matthew was sleeping, notwithstanding the absence of direct proof of exactly how close the shot came to hitting Matthew. Id. The fact that the bullet never made its way into Matthew's bedroom is of no moment. See Commonwealth v. Walker, 460 Mass. 590, 615-616 (2011) (bullet came "reasonably close" to hitting intended target even though it struck barrier).

ii. Intent to murder. Relatedly, the defendant argues that there was insufficient evidence that he held a specific intent to murder Fargas. We again are unpersuaded.

7

Citing to Commonwealth v. Horne, 466 Mass. 440, 445 (2013), the thrust of the defendant's argument is that the defendant's actions in "shooting up" the house amount to a textbook example of wanton and reckless conduct, not an assault committed with a specific intent to murder. Horne, supra at 441, was an appeal about whether the defendant there was entitled to a jury instruction on involuntary manslaughter. In that context, the court, of course, was required to view the evidence in the light most favorable to the defendant. By contrast, in considering this defendant's claim of insufficiency, we are required to view the evidence in the light most favorable to the Commonwealth. There was evidence that the defendant specifically asked for Fargas ("where's Cuavo?") before firing multiple shots into the home including toward the upstairs where he reasonably could have concluded Fargas was then located. This was sufficient to support a jury finding that the defendant acted with a specific intent to murder Fargas. See Andrade, 488 Mass. at 544; Commonwealth v. Tavares, 471 Mass. 430, 435 (2015).

2. Identification evidence. Prior to trial, the defendant filed a motion to suppress Thompson's pretrial identification of him from the photographs, both the Facebook photo that she found on her own and the photo she selected from the photo array assembled by the police. The motion judge denied that motion following an evidentiary hearing. The Commonwealth later filed

8

a motion in limine seeking approval to ask Thompson to identify the defendant at trial based on her having selected his photo from the photo array, and the defendant filed his own motion in limine seeking to preclude an in-court identification.  The trial judge summarily ruled in the Commonwealth's favor at the beginning of the trial, explaining that the motion judge "addressed this issue square on and has adjudicated it."  That recollection was in fact inaccurate, because the motion judge never addressed whether Thompson should be allowed to make an in-court identification.[8]  With the Commonwealth having prevailed on its motion in limine, the prosecutor twice asked Thompson during her testimony whether she could identify the defendant as the shooter.  Over the defendant's renewed objections, twice she did so.

On appeal, the defendant challenges both the motion judge's denial of his motion to suppress the pretrial identifications, and the trial judge's allowance of the in-court identifications. We address these in turn.

---

[8] On its face, the motion to suppress requested suppression of both "all in-court and out-of-court identifications of the Defendant by the Commonwealth's witness Feleisha Thompson." However, the defendant made no argument to preclude any in-court identifications in his memorandum of law in support of that motion or at the hearing on the motion; rather, the focus entirely was on whether to suppress the pretrial identifications.

a.  Pretrial identifications.  Thompson was the only witness at the evidentiary hearing.  The motion judge found her "direct, forthright and credible" and without any "apparent motivation for identifying the defendant as the shooter, other than to provide accurate information."  Accordingly, the judge's detailed findings were based "primarily on her testimony."  Her testimony at the evidentiary hearing was largely consistent with her later trial testimony (summarized above), although there were some discrepancies that the defendant sought to exploit for impeachment purposes at trial.[9]

At the evidentiary hearing, Thompson provided some explanation as to how she came across a photograph of the defendant on Facebook.  Specifically, she testified that in the aftermath of the shooting incident, Fargas had a phone conversation with an unidentified third party trying to figure out who the shooter was.  From overhearing that conversation, Thompson learned that the shooter was someone who went by the name "Joey Crack."  Thompson then went on Facebook and searched for that name to see if she could find him.  In fact, she found six or seven separate Facebook accounts associated with the name

---

[9] For example, there were differences with respect to the start time and length of party, the number of alcoholic drinks she had consumed, whether she specifically had seen the man who walked up the driveway carrying a gun, and whether she got a frontal view of him or merely one from the side.

Joey Crack.  On one of those Facebook pages, she saw a photograph that she recognized as the shooter.  Thompson passed that information along to the police, who up to that point had had no involvement in Thompson's own investigation.

The fact that Thompson conducted her own investigation without police involvement does not mean that the defendant is precluded from challenging the identifications based on common law principles of fairness.  See Commonwealth v. Jones, 423 Mass. 99, 109 (1996).  It does, however, heighten the burden that the defendant must overcome for suppressing the fruits of Thompson's investigation.  Specifically, the question is whether the out-of-court identifications should be deemed unreliable because they were the product of a "'highly' or 'especially' suggestive confrontation with the defendant."  Commonwealth v. Johnson, 473 Mass. 594, 598-599 (2016), quoting Jones, supra.  The motion judge did not abuse his discretion in concluding that the defendant had not met this high standard.  While there was some suggestiveness inherent in Thompson's searching through Facebook (given that, by that point, she had come to believe that the shooter went by the name Joey Crack), her following up on that lead did not taint the process in a manner that rendered her identification of the photograph so unreliable that the judge was required to exclude it.  In fact, any suggestiveness here was significantly less than that in Commonwealth v. Jules,

11

464 Mass. 478, 488-491 & 488 n.15 (2013), a case in which the court ruled that the defendant lacked a viable claim for suppression. In Jules, supra, an eyewitness had identified the defendant from a newspaper photograph that showed him in handcuffs, with a caption that identified him as the person charged with brutal murder.[10]

We further conclude that the motion judge did not abuse his discretion in denying the defendant's motion to suppress with respect to the photo array process that the police administered. The applicable question is not whether the photo array was somewhat suggestive (in so far as Thompson already had identified the Facebook photograph of the defendant as the shooter), but whether it was "unnecessarily suggestive." Johnson, 473 Mass. at 597, quoting Commonwealth v. Crayton, 470 Mass. 228, 235 (2014). It was not unnecessarily suggestive, because the police had "good reason" to include a photograph of the defendant in the array. Johnson, supra ("inquiry focuses on whether police had 'good reason' to engage in a suggestive identification procedure"). Moreover, the fact that the police used a different photograph of the defendant in the array minimized any suggestiveness. Finally, we note that the

---

[10] The fact that Thompson found six or seven Facebook accounts associated with the name Joey Crack further reduced any suggestiveness.

particular manner in which the array was assembled and shown to Thompson was in most respects exemplary.[11]  There was no error in the denial of the motion to suppress.

b.  In-court identifications.  That leaves the question whether Thompson should have been allowed to make identifications of the defendant in court.  "If an eyewitness 'made something less than an unequivocal positive identification of the defendant' during an out-of-court identification procedure, that witness may not make an in-court identification without 'good reason.'"  Commonwealth v. Yang, 98 Mass. App. Ct. 446, 448 (2020), quoting Commonwealth v. Collins, 470 Mass. 255, 265 (2014).  "An unequivocal positive identification occurs if the witness 'identifies the defendant as the perpetrator, such that the statement of identification is clear and free from doubt.'"  Yang, supra, quoting Commonwealth v. Dew, 478 Mass. 304, 315 (2017).

The Commonwealth's motion in limine relied entirely on Thompson's identification of the defendant in the photo array process.  Although that motion cited the leading applicable case law, including Crayton and Collins, it did not provide any

_____

[11] One respect in which the photo array was less than exemplary is that the defendant's photo appeared with a light blue background, while the background for all of the other photographs was dark blue.  Although this arguably made the defendant's photo stand out from the others somewhat, we conclude that this did not make the array unduly suggestive.

13

detailed analysis as to how the tests enunciated by those cases were satisfied. Instead, the Commonwealth took the position that the issue was resolved by the motion judge's denial of the motion to suppress. As noted, that was inaccurate, and the Commonwealth laudably has since abandoned such a claim.

The Commonwealth nevertheless argues that the allowance of its motion in limine can be justified on other grounds. To the extent that it argues that Thompson's identification of the defendant in the photo array was "unequivocal," we disagree. While ninety percent is higher than the eighty percent present in Yang, 98 Mass. App. Ct. at 447-448, it still cannot reasonably be said to be "clear and free from doubt," id., quoting Dew, 478 Mass. at 315. The fact that Thompson offered potentially sound reasons why she was not sure of her identification was for the jury to weigh in considering the strength of her pretrial identifications, not a basis for allowing her to identify the defendant in court.[12]

The Commonwealth additionally argues that even if the photo array did not constitute an unequivocal pretrial identification, Thompson's identification of the defendant on the Facebook page

---

[12] This is not a case like Commonwealth v. Santiago, 100 Mass. App. Ct. 700, 709 (2022), in which the witnesses "initially appeared to express some uncertainty in making their identifications, but later testified that they in fact had been certain all along and had expressed equivocation only because they were afraid."

did, and that this provided an independent basis for satisfying the rule established by Collins. To be sure, when Thompson testified about finding the photograph on Facebook, she did not volunteer that she had any residual doubt about the identification. But neither did she express certitude about it; she was never asked either way.[13] Assuming arguendo that the Commonwealth did not waive the argument that the Facebook identification provided sufficient certitude to allow an in-court identification by never raising it as a ground for its motion in limine, we view it as too slender a reed to support that argument.[14]

As the Commonwealth highlights, even where a pretrial identification was less than unequivocal, an in-court identification can be allowed for "good reason." The problem is that the trial judge did not find any such good reason; indeed, nothing indicates that he ever considered whether good reason

_____

[13] In fact, her testimony at the motion to suppress hearing identifying the person shown in the Facebook photo as the shooter came down to a single sentence in which she said the photo showed "the person that I seen that night." The focus of the motion to suppress hearing was on the photo array identification, and Thompson's spotting him on the Facebook page served principally to explain how his photo came to appear in the photo array.

[14] We pass over the question whether satisfying the Collins test is by itself enough to allow an in-court identification where the pretrial identification at issue was suggestive. See Dew, 478 Mass. at 317-318 (Gants, C.J., concurring).

15

existed.  Nor is any such good reason obvious on the current record.  Although Thompson's opportunity to see the defendant was not so evanescent as to be inherently suspect, neither was it particularly robust.  This is not a case where the witness knew the defendant or otherwise had an extended opportunity to observe him.  Compare Commonwealth v. Fielding, 94 Mass. App. Ct. 718, 719, 723 (2019) (good cause for in-court identification based on victim's and defendant's thirty minutes of close interaction); Commonwealth v. Stewart, 94 Mass. App. Ct. 485, 488 (2018) (good cause for in-court identification by eyewitnesses to crime who never lost sight of defendant before police arrived).

Thompson testified that the defendant was in her presence at the party for on the order of ten minutes, and during that time, she never spoke with him and her attention was focused instead on the inebriated Fargas.

The Commonwealth lastly argues that any error here was harmless, because the in-court identifications were largely duplicative of the pretrial identifications.  The fact that the witness already had testified that she was ninety percent sure that the person in the photograph shown to her was the shooter does not render the in-court identifications duplicative.  The rule in Collins "was born from concerns of confirmation bias produced by the prosecution of a defendant after an equivocal

16

identification and by the risk that a jury may accord undue weight to the in-court identification, ignoring the initial out-of-court equivocation." Commonwealth v. Santiago, 100 Mass. App. Ct. 700, 709 (2022). In light of such concerns, we cannot reasonably say that we are confident that the jury were not swayed by the in-court identifications.[15]

3. Conclusion. We vacate the defendant's convictions and set aside the verdicts, while recognizing that the Commonwealth is free to seek retrial of all indictments in its discretion.

So ordered.

By the Court (Milkey, Sacks & Smyth, JJ.[16]),

Assistant Clerk

Entered: May 30, 2024.

---

[15] We recognize that the defendant's ex-girlfriend provided corroborative evidence that he was the shooter. However, as noted, the defendant highlighted many reasons why jurors might conclude she was biased, and that evidence is relevant in our consideration whether the improperly admitted in-court identifications were prejudicial.

[16] The panelists are listed in order of seniority.

17