Commonwealth *v.* Spray.

## Commonwealth *vs.* Quillie Merle Spray, Second.

Worcester. November 8, 2013. - March 13, 2014.

Present: Ireland, C.J., Spina, Cordy, Duffly, & Lenk, JJ.

*Homicide. Firearms. Evidence,* Credibility of witness, Firearm, Hearsay, Identification of inanimate object, Testimony of third party respecting identification, Insanity, Admissions and confessions, Voluntariness of statement. *Due Process of Law,* Hearing. *Practice, Criminal,* Assistance of counsel, Capital case, Defendant's competency, Hearsay, Motion to suppress, New trial, State of mind, Trial of indictments together, Admissions and confessions, Voluntariness of statement, Witness. *Insanity. Constitutional Law,* Assistance of counsel, Admissions and confessions.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements he made to police, where the questions officers asked the defendant did not contain an intentional misrepresentation or false statement, and officers neither exaggerated the strength of the case against the defendant nor implied that confessing would benefit him; where the defendant's invocation of his right to counsel immediately after making an inculpatory statement did not render his statement involuntary; where there was no indication that the defendant was mistreated; and where, before a delay in questioning, the defendant had been advised of his rights to a prompt arraignment and had executed a waiver. [466-468]

At a criminal trial, the defendant suffered no prejudice from the joinder of firearms charges that were not "related offenses" to a murder charge, where there was no specific right or defense tactic that was unavailable to him as a result of the joinder, and where, in any event, the jury acquitted him of the firearms charges. [468-469]

At a murder trial, even if the admission of evidence of hearsay testimony from a State trooper that the defendant's brother had identified a knife belonging to the defendant were error, no substantial likelihood of a miscarriage of justice arose, where the linkage between the defendant and the murder that the identification provided was cumulative of other testimony and forensic evidence. [469-471]

A Superior Court judge did not abuse his discretion in denying the criminal defendant's first motion for a new trial without a hearing, where the judge reviewed affidavits from the defendant's siblings recanting their trial testimony and determined not only that the affidavits were not credible, but also that the absence of the siblings' testimony at the defendant's trial would not have changed the verdict. [471-472]

A Superior Court judge did not err in concluding that the criminal defendant's trial counsel did not provide ineffective assistance for failing to investigate an insanity defense, where the only information concerning possible mental

illness of which trial counsel was on notice was a "break" that had occurred some two decades earlier, where no information was available to her regarding the defendant's current mental state that would have suggested a lack of criminal responsibility, and where, given the year the murder occurred, trial counsel's failure to investigate a mental health defense did not fall below constitutional standards of competency. [472-477]

INDICTMENTS found and returned in the Superior Court Department on April 6, 2001.

Pretrial motions to suppress evidence were heard by *Peter W. Agnes, Jr.*, J., the cases were tried before him, and a motion for a new trial, filed on February 28, 2007, was considered by him; and a second motion for a new trial, filed on July 14, 2010, was heard by *John S. McCann*, J.

*Kenneth I. Seiger* for the defendant.

*Donna-Marie Haran*, Assistant District Attorney, for the Commonwealth.

LENK, J. The defendant appeals from his conviction of murder in the first degree on a theory of extreme atrocity or cruelty, and from the denial of two motions for new trial. The defendant, his brother, his sister-in-law, and his cousin worked together in a tiling business based in Oklahoma. While working on a job at a restaurant in Clinton, the defendant stabbed and killed the general manager with no apparent provocation or motive. The defense at trial was based on a theory of actual innocence and that the defendant's sister-in-law was the true culprit.

The defendant argues error in the denial of a motion to suppress statements; improper joinder of charges for trial; admission of certain hearsay evidence; and the denial of his first motion for a new trial without an evidentiary hearing. The defendant also argues that his trial counsel was ineffective for failing to pursue a defense of lack of criminal responsibility, based on evidence that the defendant may have been suffering from a spontaneous recurrence of methamphetamine-induced psychosis at the time of the stabbing.

We conclude that there was no error requiring reversal and, after a review of the entire record pursuant to our responsibility under G. L. c. 278, § 33E, that there is no reason to exercise our power to reduce the defendant's conviction to a lesser degree of guilt or to order a new trial. We affirm.

1. *Background.* a. *Facts.* Based on the evidence at trial, the jury could have found the following. In December, 2000, a fast-food restaurant was under construction in Clinton. The defendant, his brother Gary Spray, his sister-in-law Monica Spray, and his cousin Thomas Barron,[1] who lived in Oklahoma and all worked together on tiling jobs there, were hired to install tile in that restaurant. The defendant, Gary, Monica, and occasionally Thomas had worked in similar jobs across the country; Gary and Monica often worked as a team on such jobs, while the defendant worked by himself.

Gary, Monica, and Thomas initially were solely responsible for the December, 2000, job in Clinton. However, they were delayed in starting the 1,500-mile drive to Massachusetts, and the defendant decided to travel to Clinton as well. He drove to Massachusetts alone, arriving in Clinton in the early morning hours of Thursday, December 7, 2000. Gary, Monica, and Thomas arrived in a separate vehicle late that afternoon; their arrival was delayed by an unscheduled stop in St. Louis, where they had "a little drug party" involving mostly methamphetamines. While at the job site on Friday, the defendant and Gary spoke with the general contractor, who observed that they were already behind schedule.

The victim, Sherylann Miller, was also present at the construction site where the defendant and his relatives were working. Miller was the general manager of the future restaurant, and was in the process of accepting job applications and conducting interviews for employment there. Since the heating system had yet to be installed, the area was being kept warm by propane heaters. At one point, the defendant heard the victim say that she was cold, and suggested that she move closer to the heater; she also apologized to the defendant when she stepped on freshly laid tile. The two had no prior relationship and did not interact any further that day.

At approximately 4 P.M. on Saturday, December 9, the defendant, Gary, Monica, and Thomas were working at the job site when the defendant walked out the door. The other three con-

---

[1]Because they share a last name, we refer to husband and wife Gary Spray and Monica Spray by their first names. For consistency, we also refer to the defendant's cousins Thomas Barron and Terry Barron by their first names.

tinued to install tile until they heard the victim "hollering," "No, don't!" and "Stop, stop!" Monica turned around to see the defendant "wrestling" with the victim and "punching on her" while "dragging her backwards." Thomas saw the defendant holding the victim "around the waist or kind of in a bear hug."

Monica began "jumping up and down and hitting herself in the chest," and said to Gary, "It's Merle, it's Merle."[2] Gary turned around to see the defendant "punching [the victim] in the back." Gary ran to the defendant, pushed him against the wall, and asked, "What the fuck are you doing? What are you doing to this lady?" The defendant responded, "We'll tell them somebody else done it." By that time, the victim had fallen to the floor and a large amount of blood had begun to flow from her body. Gary directed Monica and Thomas to telephone for help. Monica ran to a nearby gasoline station and the attendant there telephoned 911. The defendant walked to the front of the restaurant, saying, "Let's get this tile laid so we can get out of here and go to the house."

Clinton police responded within two minutes of receiving the 911 call. They encountered the family in various states of shock outside the restaurant. Monica was "hysterical"; Thomas was pacing nervously and crying; and Gary was standing over the defendant, yelling repeatedly, "What the fuck did you do that for?" The defendant was sitting on the curb outside the restaurant, acting "very calm" and not seeming at all upset. Monica pointed to the defendant and said, "He stabbed her, he did it." Thomas and Gary also indicated to police that the defendant had stabbed the victim. In response to questions regarding the whereabouts of the weapon, Gary stated that the defendant had had a knife, and that it had a green handle and a blade approximately five inches in length.

Police found the victim lying on the floor in the back of the restaurant with a large pool of blood around her head. The victim was transported to a local hospital, and then transferred via helicopter to a hospital in Worcester, where she was pronounced dead in the early morning hours of the following day.

Shortly after police arrived and his relatives identified him as

---

[2]The defendant was known by his middle name, Merle.

the one who had stabbed the victim, the defendant was arrested, handcuffed, and placed in a police cruiser. Gary continued to yell at the defendant while he sat in the cruiser, "What are you doing, you didn't even know her." Monica was permitted to change clothes and throw out the clothing she had been wearing, as she had soiled herself.

The defendant, Gary, Monica, and Thomas were transported in separate police cruisers to the Clinton police station. There, Gary, Monica, and Thomas each gave a written statement while sitting in separate rooms; police observed that none appeared to be under the influence of drugs or alcohol. Gary again provided a description of the weapon used in the attack, and said that he had seen the defendant kneel down beside a bucket at the scene.[3] Officers located the bucket, filled with dirty water and plaster or mud, and retrieved a green-handled knife with a serrated edge from it; a red-handled knife was also recovered from the scene. The green-handled knife was brought back to the police station, where Gary identified it as belonging to the defendant.[4]

While the defendant was booked[5] and fingerprinted, officers observed a cut on his left hand. A Clinton police officer and a State trooper interviewed the defendant after reading him the Miranda rights and presenting him with a card listing those rights, which he initialed. The defendant agreed to speak with police and to allow police to transcribe his statement. During the interview, the defendant denied having had anything to do with the stabbing; police described him as "calm, cool, collected, very cooperative," and said that he did not appear to be under the influence of drugs or alcohol. Later that evening, the

---

[3]Gary testified that he had given police information regarding the weapon only because police threatened that, if he did not do so, neither he nor Monica nor Thomas would be permitted to leave the Commonwealth. The officers denied making any threats.

[4]One of the general contractor's employees also testified at trial that he had seen a green-handled knife with a serrated edge on the floor beside the defendant while he was working on Friday afternoon. While Gary acknowledged having identified the weapon, he denied that the knife produced at trial belonged to the defendant. The defendant also denied that the knife produced at trial belonged to him, and stated that he did not bring his green knife with him on the trip from Oklahoma to Massachusetts.

[5]As part of the booking process, the defendant was advised of the Miranda rights, a printed copy of which also appeared on the booking sheet.

defendant's vehicle was towed; an inventory search produced an unlicensed firearm, ammunition, and spent shell casings.

At approximately 2 A.M. Sunday morning, police learned that the victim had died as a result of her injuries, and booked the defendant on the additional charge of murder. Later that afternoon, after advising him of the Miranda rights, and procuring a waiver of his right to a prompt arraignment pursuant to *Commonwealth* v. *Rosario*, 422 Mass. 48 (1996) (*Rosario*), police again interviewed the defendant. He denied knowing anything about the source of the victim's injuries, but, in response to repeated questioning, eventually stated, "If I did do it, I didn't mean to kill her."

An autopsy revealed that the victim died as a result of six stab wounds to the neck, and that her injuries were consistent with having been stabbed from behind. Two of the wounds severed her spinal cord. Forensic testing established that a sample from a blood stain on the defendant's shirt cuff matched the victim's blood.[6] A hair matching the victim's was found on the green knife, as well as a piece of fabric that was consistent with the fabric of the jacket that the victim was wearing at the time of the attack.

b. *Pretrial motions.* The defendant filed a pretrial motion to suppress all statements made by him to the police, as well as all evidence obtained as a result of the search of his vehicle. He argued that the statements made to the police should be suppressed as involuntary, and that items found in his vehicle should be suppressed because they were the result of an illegal warrantless search. Both the defendant and the Commonwealth filed motions in limine regarding the admissibility of the statements made by the defendant's family members to the police.

After a hearing at which a number of local and State police officers testified, the motion judge allowed the defendant's motion in part and denied it in part. The judge held that, with regard to the police interviews of the defendant on December 9 and 10, 2000, the Commonwealth had met its burden of proving a valid waiver of Miranda rights beyond a reasonable doubt; the defendant had signed a written waiver form and there was no

---

[6]The defendant's shirt cuff was the only portion of his clothing that tested positive for human blood.

evidence that the defendant was under the influence of drugs or alcohol, and no evidence of police coercion. However, the judge ruled that, because the second interview came to an end when the defendant said, "I think I need a lawyer," no subsequent statement could be admitted unless the Commonwealth proved that the defendant initiated further communication with police officers. See *Commonwealth* v. *Contos*, 435 Mass. 19, 30 (2001). Since the Commonwealth failed to meet this burden, the judge suppressed the defendant's statements to police after the termination of the second interview when an officer approached him to ask about ownership of the firearm found in his vehicle.

The judge ruled that the warrantless search of the defendant's vehicle was lawful as an inventory search of an impounded vehicle, and that the firearm and ammunition discovered during the search should not be suppressed. The judge determined that "it was reasonable for the police to take measures to guard against a potential claim of liability," where the vehicle was exposed to a risk of theft or vandalism where it was parked, and where the police had a reasonable basis to believe that the defendant would not be released due to the high cash bail.

Finally, the judge determined that statements made by Gary, Monica, and Thomas to police were admissible under the excited utterance exception to the hearsay rule, since they were made within minutes of the stabbing and there was ample evidence that each was very upset and under the influence of a startling event.

c. *Trial proceedings.* The defendant was tried on the charges of murder, assault and battery by means of a dangerous weapon, possession of a firearm in a motor vehicle, and possession of ammunition without a firearm identification card. He testified in his own defense. The defendant said that he did not kill the victim and did not know who did; he was installing tile when he looked up and saw the victim lying on the floor. When the defendant knelt down to check on her, Gary came running and shoved him against the wall, accusing him of stabbing the victim.

The defense strategy was to maintain the defendant's innocence and to suggest that Monica was the true perpetrator. Counsel suggested that Monica, as a methamphetamine addict,

robbed and killed the victim in order to obtain money for drugs. Monica's guilt was evidenced by her quickness to blame the defendant and deflect attention from herself, her melodramatic state after the attack, and the fact that, immediately after the stabbing, she threw away her clothes before the police could examine them. Because Monica "fingered" the defendant immediately, counsel argued, the police focused their investigation on the defendant from the start and, as a result, did not search Monica's vehicle. Counsel also impeached the credibility of Gary, Monica, and Thomas by pointing to their heavy methamphetamine use prior to the stabbing.

The jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty and assault and battery by means of a dangerous weapon; the defendant was acquitted of the firearms and ammunition charges. The judge dismissed the assault and battery conviction as merged with the murder conviction. See Commonwealth v. Valliere, 437 Mass. 366, 371-372 (2002).

d. First motion for new trial. In February, 2007, the defendant moved for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), on the ground that two eyewitnesses, Gary and Monica, had recanted their testimony. The defendant submitted affidavits from Gary and Monica averring that they, in fact, did not see the defendant argue with, fight with, or stab the victim. Gary stated also in his affidavit that, before trial, he wanted to alter the statement he gave to Clinton police on the evening of the stabbing, but the prosecutor told him that if he changed it, he "would do an automatic [seven] years for perjury." Monica stated that either the assistant district attorney's partner or secretary "coached [her] into saying only yes or no to defense counsel's questions [and] not to be explicit in [her] answers" and that she "was under the influence of methamphetamine and many other mind-altering drugs — [her] memory of what happened wasn't close to the truth." In response, the prosecutor submitted an affidavit stating that he never told Gary that he would serve time for perjury if he changed his statement.

The motion judge, who was also the trial judge, denied the motion without a hearing, declining to credit Gary's and Mon-

ica's affidavits. The judge found that the affidavits contradicted accounts that the two repeatedly had given throughout the proceedings as well as other evidence presented at trial, and that the affidavits were less credible in light of the six years that had passed since the stabbing. Moreover, the judge concluded that, even if the affidavits were accurate, the evidence against the defendant was "solid" without Gary's and Monica's trial testimony.

e. *Second motion for new trial.* In July, 2010, represented by new appellate counsel, the defendant filed a second motion for a new trial. He argued that trial counsel was ineffective for failing to investigate a defense based on lack of criminal responsibility, where posttrial investigation yielded substantial evidence that the defendant's mental health was impaired at the time of the stabbing. According to the defendant, affidavits of various family members and documentary evidence revealed his significant history of alcohol and methamphetamine abuse; previous psychotic episodes, including hallucinations, potentially associated with methamphetamine abuse; and the presence of various "stressors" in his life at the time of the killing. Given the unusual and apparently motiveless circumstances of the crime, and the strength of the evidence against him, the defendant asserted that trial counsel "should have recognized his prospects for acquittal were minimal — even nonexistent" and instead pursued the "obvious alternative" of a defense premised on his mental state. The defendant argued that, had evidence related to his mental state been presented to the jury, it could have influenced the verdict.

A judge who was not the trial judge denied the motion after a hearing at which a clinical psychologist, trial counsel, and the defendant testified. The psychologist, Dr. Helene Presskreischer, opined that it was most likely that,[7] at the time of the stabbing, the defendant was suffering from a spontaneous recurrence of a methamphetamine-induced psychosis and acted in what he perceived to be self-defense; this psychosis would have affected his ability to appreciate the wrongfulness of, and to control, his behavior such that he could have been found not guilty by

[7]Dr. Helene Presskreischer declined to give her opinion to a reasonable degree of psychological certainty.

reason of insanity. Presskreischer's opinion was based on the defendant's nearly twenty-year history of chronic methamphetamine abuse beginning at the age of fourteen; prior incidents of hallucinations; and certain "stressors" in his life at the time of the killing, including his father's recent death and the defendant's having taken over the family tiling business, his ongoing divorce, and the stressful and noisy working environment prior to the murder.[8]

Presskreischer testified to her review of a number of medical records and reports concerning the defendant's previous psychotic episodes. In 1997, three years before the stabbing, he was observed waving and yelling at motorists driving by his home. Police transported him to a community health center, where he reported that someone was trying to kill him and that he had seen four satellites collide over his house; he was diagnosed with amphetamine-induced psychotic disorder, with hallucination. Sometime after his father's death in 1999, the defendant's mother observed the defendant "talking crazy" and, concerned, asked his cousin Terry to come to the house. When Terry arrived, the defendant was moving about his house as if to evade detection, and was frightened that someone was trying to kill him. Terry took him to the hospital. Several months before the stabbing, Gary found the defendant in "stocking feet" outside his home, standing in snow and ice, holding a gun. He discovered that the defendant had shot bullet holes in his bathroom ceiling and garage door, in order to fend off intruders who he believed were trying to kill him. No evidence of intruders was discovered.

Presskreischer opined that, based on her observations of the defendant during their meetings, he continued to suffer from residual psychosis. She also testified to the long-term effects of methamphetamine abuse. She said that chronic abuse of the drug can lead to structural changes in the brain that may cause

---

[8]Presskreischer's conclusions were founded on, inter alia, four meetings with the defendant that lasted a total of approximately eight hours; affidavits from and communications with the defendant's friends, family, and trial counsel; the defendant's medical records; and deposition testimony from a psychiatrist retained by the decedent victim's estate in a related civil proceeding, who concluded, to a reasonable degree of medical certainty, that the defendant stabbed the victim while in a state of drug-induced psychosis.

up to three-quarters of abusers to experience psychotic episodes. She testified further that, even when active drug use has ceased, users can experience "flashbacks," or spontaneous recurrences of psychotic episodes, that may be triggered by even mild "psychosocial stressors." While the specific diagnosis of spontaneous recurrence of methamphetamine-induced psychosis was not listed in the edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) that was current at the time of trial, that edition did include a chapter on amphetamine-induced disorders; Presskreischer also submitted a bibliography of articles on the topic published in peer-reviewed journals before the date of the stabbing.

The judge found that "the post trial affidavits and expert testimony of Dr. Presskreischer suggest that methamphetamine psychosis may have been a viable defense," but nonetheless concluded that "the facts known to, or accessible to [trial counsel], did not raise a reasonable doubt as to the defendant's mental state" and that "[t]he investigation conducted by [trial counsel] was constitutionally effective based on the information available to her." The judge noted that trial counsel met with the defendant approximately twelve times prior to trial, and during such meetings, the defendant consistently maintained his innocence. Although he told trial counsel of his history of drug abuse, the defendant also stated that he was not under the influence of methamphetamine or other drugs at the time of the crime, and that he had not used any drugs on the day of the stabbing. The judge found that trial counsel conducted a reasonable investigation of the defendant's family; the defendant's mother provided the name of an Oklahoma facility where the defendant received drug and mental health treatment as a teenager, but trial counsel was unsuccessful in obtaining medical records from that facility. The judge found that trial counsel was not otherwise on notice of any mental health problems affecting the defendant, and did not observe or learn of any instances of hallucinations, delusions, or other indicators of mental illness.

The defendant appeals from his conviction of murder and from the denials of his motions for a new trial.

2. *Discussion.* a. *Denial of motion to suppress statements.*

The defendant argues that the motion judge erred in denying his motion to suppress his statement to police that "if [he] did do it, [he] didn't mean to kill [the victim]," as it was involuntary. The defendant contends that involuntariness is demonstrated by his invocation of his right to counsel immediately after making the inculpatory statement, and by the interviewing officers' use of a "ruse" while questioning him, in that they asked him why he had committed the killing after he repeatedly had denied involvement. The involuntariness of the statement was exacerbated, the defendant maintains, by his "long isolation" in a holding cell before the ruse was employed.

As in all cases where the Commonwealth intends to rely on a defendant's confession to a crime, the Commonwealth here "bear[s] the 'heavy burden of establishing that [the confession] was voluntary.' " *Commonwealth* v. *Baye*, 462 Mass. 246, 256 (2012), quoting *Commonwealth* v. *Meehan*, 377 Mass. 552, 563 (1979), cert. dismissed, 445 U.S. 39 (1980). "In meeting this burden, the Commonwealth must prove beyond a reasonable doubt that 'in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne,' but rather that the statement was 'the result of a free and voluntary act.' " *Id.*, quoting *Commonwealth* v. *Durand*, 457 Mass. 574, 595-596 (2010).

While police officers' use of trickery and other deceptive tactics during an interrogation may cast doubt on both the validity of a suspect's waiver of rights and the voluntariness of any ensuing confession, "the interrogator's use of trickery is to be considered as part of the totality of the circumstances." *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 433 (2004). "[W]here the use of a false statement is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression." *Id.*

The officers' interrogation tactics in this case were not of a variety that we have previously condemned as impermissibly misleading. The officers properly questioned the defendant about the circumstances of the stabbing and any involvement he had in it. Although they varied their line of questioning at one point to ask why the defendant had committed the crime, such a change in the form of a question falls far short of an intentional

misrepresentation that "may undermine 'the defendant's ability to make a free choice,' " *Commonwealth* v. *Scoggins*, 439 Mass. 571, 576 (2003), quoting *Commonwealth* v. *Meehan*, *supra* at 563, nor does it constitute a false statement. At no point did officers improperly imply that confessing would benefit the defendant, or exaggerate the strength of the evidence against him. See *Commonwealth* v. *Johnson*, 463 Mass. 95, 105 (2012).

That the defendant invoked his right to counsel immediately after making the inculpatory statement does not render otherwise voluntary statements involuntary. Cf. *Commonwealth* v. *Contos*, 435 Mass. 19, 27-32 (2001) (statements made after invocation of right to counsel should have been suppressed, but error was harmless where statements "mirrored" similar voluntary statements made prior to invoking right). The same is true regarding the length of time between the defendant's initial arrest and the time at which the statement in question was made. Although the statement was made during an interview in the midafternoon of the day following his arrest, after the defendant had been held in the police station overnight, he was advised properly of his right to a prompt arraignment under *Rosario*, *supra*, and executed a waiver. There is no indication that the defendant was deprived of food or sleep while being held at the police station, nor is there any suggestion "that the delay in any way tainted the otherwise free, intelligent and voluntary statements of the defendant." *Commonwealth* v. *Butler*, 423 Mass. 517, 526 (1996).

b. *Joinder of charges at trial.* The defendant argues that the joinder of the firearms charges with the murder charge for trial posed a substantial likelihood of a miscarriage of justice, where they were not "related offenses" within the meaning of Mass. R. Crim. P. 9 (a), 378 Mass. 859 (1979).

Mass. R. Crim. P. 9 (a) permits the joinder of "related offenses" for trial "if they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." "Factors a judge may consider in determining whether offenses are related include factual similarities, . . . closeness of time and space[, and] . . . whether evidence of the other offenses would be admissible in separate trials on each offense." *Commonwealth* v. *Pillai*, 445 Mass. 175,

180 (2005), and cases cited. "Offenses are related if the 'evidence in its totality shows a common scheme and pattern of operation that tends to prove' each of the complaints." *Id.*, quoting *Commonwealth* v. *Feijao*, 419 Mass. 486, 494-495 (1995). See *Commonwealth* v. *Sylvester*, 388 Mass. 749, 755-758 (1983).

A defendant claiming that two or more offenses have been joined improperly for trial bears the burden of demonstrating prejudice from misjoinder. *Commonwealth* v. *Zemtsov*, 443 Mass. 36, 45 (2004). "Prejudice requiring severance does not arise from the mere fact that the defendant's chances for acquittal of [one of the charges] might have been better" had the offenses been tried separately. *Commonwealth* v. *Gallison*, 383 Mass. 659, 672 (1981). Rather, the defendant must show that a particular tactic or right was foreclosed by the joinder. See *id.*

Here, while the firearms and murder charges were not "related offenses," the defendant has not met his burden of demonstrating a specific ground of prejudice. It is the case, as the defendant argues, that "the firearms charges were entirely distinct from the homicide." The victim was stabbed with a knife; the firearm played no role in the attack, but was discovered in the defendant's vehicle as part of an inventory search following his arrest, along with ammunition. However, the defendant claims only that joinder tended to show his bad character or propensity to commit a crime; he does not point to a specific right or defense tactic that was unavailable to him as a result of such joinder. In any event, the jury acquitted the defendant of the firearms charges. "Such discernment by the factfinder in assessing the evidence is a strong indication that a misjoinder of offenses has not resulted in any actual prejudice to the defendant." *Commonwealth* v. *Green*, 52 Mass. App. Ct. 98, 103 (2001). See *Commonwealth* v. *Delaney*, 425 Mass. 587, 595 (1997), cert. denied, 522 U.S. 1058 (1998).

c. *Admission of hearsay evidence.* The defendant argues that the improper admission of hearsay evidence created a substantial likelihood of a miscarriage of justice. Specifically, he contends that testimony from a State trooper regarding Gary's identification of the green-handled knife as belonging to the defendant, not objected to at trial, was improper, since too much time had elapsed for it to qualify as an excited utterance; made almost

five hours after the stabbing at the police station, it was not a "spontaneous reaction to an exciting event." *Commonwealth* v. *DiMonte*, 427 Mass. 233, 240 (1998).

The Commonwealth argues that the testimony was proper as an extrajudicial identification, rather than as an excited utterance. "Testimony by a third party, such as a police officer, regarding a witness's extrajudicial identification is substantively admissible if the identifying witness is unable or unwilling [to make an identification] in court and is available for cross-examination . . . . [I]t is immaterial that the identifying witness disavows having made a prior extrajudicial identification, or even denies having any basis for making an identification." *Commonwealth* v. *Raedy*, 68 Mass. App. Ct. 440, 446-447 (2007), citing *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 441 (2005). Such testimony is admissible to establish identifying features of a defendant "because of the superior probative worth of an identification made closer in time to the events in question." *Commonwealth* v. *Daye*, 393 Mass. 55, 61 (1984), overruled on other grounds by *Commonwealth* v. *Cong Duc Le, supra*. Where the identifying witness disavows his or her earlier identification, other prior identification testimony can be put to the jury, who "can determine whose version to believe." *Commonwealth* v. *Cong Duc Le, supra* at 439-440. In addition to testimony regarding the defendant's physical characteristics, see *Commonwealth* v. *Weichell*, 390 Mass. 62, 72 (1983), cert. denied, 465 U.S. 1032 (1984), we have permitted descriptions of the weapon used by the defendant under this rule. See *Commonwealth* v. *Martinez*, 431 Mass. 168, 170-171,. 175-176 (2000) (statement regarding color of defendant's gun, by declarant who knew that defendant possessed silver gun and saw him shoot victim with it, was properly admitted).

Here, though he denied that the knife produced at trial belonged to the defendant, Gary both testified that he previously had identified the knife as the defendant's and was available for cross-examination. The knife had unique features, including a green handle and a serrated edge, and matched the earlier description that Gary had given to police at the scene of the crime. However, Gary did not witness the defendant use the knife to

commit a crime, as in *Commonwealth* v. *Martinez, id.* at 171, but rather identified the knife on the basis of his personal knowledge regarding his brother's possessions. Neither is it clear from the record when Gary last saw the defendant in custody of the knife.

Assuming without deciding, however, that it was error to admit the testimony, any such error did not create a substantial likelihood of a miscarriage of justice. Although the testimony created an additional linkage between the defendant and the stabbing, that linkage was cumulative of other evidence against the defendant, including testimony about Gary's description of the defendant's knife at the scene of the crime, testimony from an employee of the general contractor who saw a green knife next to the defendant before the stabbing, eyewitness accounts, and forensic evidence.

d. *Denial of first motion for new trial without hearing.* The defendant argues that it was error to deny the first motion for a new trial without a hearing, particularly where the motion was based on recantation affidavits of Gary and Monica. The defendant maintains that an evidentiary hearing on the motion was required, given that recantation by witnesses requires "serious consideration from the motion judge." See *Commonwealth* v. *Jones*, 432 Mass. 623, 632-633 (2000), quoting *Commonwealth* v. *Watson*, 377 Mass. 814, 837-838 (1979), *S.C.*, 409 Mass. 110 (1991).

Because the defendant's appeals of the denial of his first and second motions for a new trial have been consolidated with his direct appeal, we review them under the substantial likelihood of a miscarriage of justice standard. *Commonwealth* v. *Gomez*, 450 Mass. 704, 711 (2008), citing *Commonwealth* v. *Morgan*, 449 Mass. 343, 353 (2007). See G. L. c. 278, § 33E. Further, with respect to the first motion for a new trial, "[i]n reviewing an order granting or denying a motion for a new trial, we accord deference to the views of a motion judge who was also the trial judge." *Commonwealth* v. *LeFave*, 430 Mass. 169, 176 (1999), citing *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). Even where a motion for a new trial is based on the recantation of trial witnesses, a defendant "may be required to present the evidence upon affidavits alone." *Commonwealth* v.

*Jones, supra* at 632, quoting *Commonwealth* v. *Coggins,* 324 Mass. 552, 557, cert. denied, 338 U.S. 881 (1949). The decision to grant or deny a motion for a new trial "is left to the sound discretion of the motion judge." *Id.* at 633, citing *Commonwealth* v. *Stewart,* 383 Mass. 253 (1981).

Here, the motion judge, who was also the trial judge, reviewed the recantation affidavits and determined that they were not credible, and, even if true, the absence of Gary's and Monica's testimony at trial would not have changed the verdict. In denying the motion for a new trial without a hearing, the motion judge properly "[took] into account his knowledge of what occurred at trial [in order to] assess questions of credibility." *Commonwealth* v. *Ortiz,* 393 Mass. 523, 536-537 (1984), citing *Commonwealth* v. *Little,* 384 Mass. 262, 269 (1981). There was no abuse of discretion.

e. *Ineffective assistance of counsel.* The defendant argues that in deciding the second motion for a new trial, the motion judge erred in "papering over a wealth of evidence" regarding the inadequacy of trial counsel's investigation of a defense based on the defendant's mental health. The defendant contends that trial counsel's forgoing of a comprehensive examination of the defendant's mental state and reliance instead on "so palpably inadequate a defense" of actual innocence was constitutionally ineffective assistance.

Pursuant to G. L. c. 278, § 33E, we consider claims of ineffective assistance to determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992). If we conclude "that counsel erred by failing to raise a substantial defense, 'a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same.' " *Commonwealth* v. *Sena,* 429 Mass. 590, 595 (1999), *S.C.,* 441 Mass. 822 (2004), quoting *Commonwealth* v. *Ruddock,* 428 Mass. 288, 292 n.3 (1998).

"Failure to investigate an insanity defense would fall below the level of competence demanded of attorneys, if facts known to, or accessible to, trial counsel raised a reasonable doubt as to

the defendant's mental condition." *Commonwealth* v. *Doucette*, 391 Mass. 443, 458-459 (1984), citing *Osborne* v. *Commonwealth*, 378 Mass. 104, 111 (1979). Such a failure to investigate an insanity defense is especially unreasonable where it is the only viable defense available to a defendant. See, e.g., *Commonwealth* v. *Haggerty*, 400 Mass. 437, 441-442 (1987) (defendant deprived of effective assistance of counsel where "defense counsel abandons the only defense available to a defendant and leaves the defendant without any defense at all"). However, a decision not to pursue an insanity defense for tactical reasons, for instance because in the circumstances the defense would be factually weak, is not tantamount to ineffective assistance of counsel. See, e.g., *Commonwealth* v. *Genius*, 387 Mass. 695, 699 (1982), *S.C.*, 402 Mass. 711 (1988).

The defendant argues that this case is akin to *Commonwealth* v. *Roberio*, 428 Mass. 278, 279-282 (1998), *S.C.*, 440 Mass. 245 (2003), where we held that the defendant's right to effective assistance of counsel was violated by trial counsel's failure to investigate a defense based on a lack of criminal responsibility. In that case, the defendant's parents told defense counsel, prior to trial, that the defendant had received mental health treatment at the suggestion of the police, "before [the] crime and before trial." *Id.* at 279. Trial counsel did not follow up on this information, nor did he attempt to obtain further information from the local mental health center or ask the defendant to submit to a psychiatric evaluation. *Id.* Instead, trial counsel made his own assessment of the defendant's mental health. *Id.* We stated in that case that trial counsel "could not have made an accurate assessment of the defendant's mental state at the time of the crime without expert training." *Id.* at 279 n.2. The defendant argues that here, likewise, trial counsel's opinion as to his mental state was an inadequate substitute for a court-appointed psychiatric evaluation.

The Commonwealth maintains that the circumstances here instead should be compared to *Commonwealth* v. *Walker*, 443 Mass. 213, 225-228 (2005), where we rejected the defendant's argument that trial counsel rendered ineffective assistance. There, trial counsel was aware of the defendant's history of alcohol and drug abuse, his prior suicide attempt, and the fact

that he had been discharged from the armed services due to psychiatric problems. *Id.* at 223. However, we held that such facts were insufficient to suggest a potential mental health defense, where the suicide attempt and discharge had occurred thirteen years previously and neither incident suggested that the defendant was suffering from mental illness at the time of the crime. *Id.* at 225. Moreover, in meetings with trial counsel, the defendant consistently presented himself as a responsible father and maintained that he had committed the crime in self-defense. *Id.* at 226. The Commonwealth argues that trial counsel similarly lacked notice of the defendant's mental problems in this case, and that a defense based on a lack of criminal responsibility would have been inconsistent with the defendant's adamant and unfailing denial of any involvement in the killing.

Although the question is a close one, we are ultimately convinced that trial counsel's assistance was not ineffective. It remains the case that an attorney's own assessment of her client cannot replace the opinion of a mental health professional with expert training, see *Commonwealth* v. *Roberio, supra* at 279 n.2; however, here, there were no facts known or accessible to trial counsel that would have put her on notice of the need to obtain a psychiatric evaluation of her client, even after she conducted additional investigation.

Trial counsel met with the defendant approximately twelve times. During those meetings, the defendant did not appear to be suffering from psychiatric problems, nor did he report any prior hallucinations. Although he discussed his history of chronic methamphetamine abuse, and the fact that he had been treated for alcohol abuse as a teenager, he stated that he was not under the influence of methamphetamine at the time of the stabbing, nor had he consumed the drug that day. There is no suggestion in the record that he told counsel of any prior psychotic episodes or hallucinatory behavior. The defendant complied with counsel's recommendations as to how to conduct himself during the arraignment, and did not exhibit hallucinatory behavior either during trial preparation or during the trial itself. There are likewise no reports in the record of the defendant suffering from any hallucinations or psychotic episodes while incarcerated awaiting trial. As in *Commonwealth* v. *Walker, supra* at 226, where the

defendant consistently maintained that he was acting in self-defense, here, too, the defendant claimed innocence, thus presenting trial counsel with a theory of defense to pursue at trial other than lack of criminal responsibility. Indeed, the two discussed strategy at their many meetings.

In addition to meeting with the defendant on twelve occasions, trial counsel actively communicated with the defendant's mother. Counsel asked her about the incident involving treatment at a rehabilitation center for alcohol abuse that the defendant had discussed with her. The defendant's mother indicated that the care the defendant had received was not, in fact, related to alcohol, but that when he was fifteen or sixteen years old,[9] the defendant had had a "break" for which he received mental health treatment. Counsel attempted to obtain the medical records, almost twenty years old, from the treatment facility, but was unsuccessful in doing so.

However, there is no evidence that the defendant's mother discussed with trial counsel the incident that the mother later recounted in her affidavit submitted in connection with the defendant's second motion for a new trial, where she spoke of the defendant "talking crazy" and being taken to the hospital, over ten months before the stabbing. There is likewise no evidence that the hallucinations described by other family members in affidavits, submitted ten years after the stabbing, were recounted to counsel before the trial in 2003. In addition to speaking with the defendant's mother, counsel spoke with the defendant's ex-wife, with his brother Gary, and with his cousin Thomas in preparing her defense. None of them mentioned that the defendant was suffering or had suffered from psychiatric problems, nor did any speak of the defendant having experienced hallucinations at any point.

Thus, the only information concerning possible mental illness of which trial counsel was on notice was a "break" that had occurred while the defendant was a teenager, approximately two decades earlier. After interviewing four different family members and attempting to locate nearly twenty year old medical records, counsel had no concrete information available to her

---

[9]The defendant was thirty-three years old at the time of the stabbing.

regarding the defendant's current mental state that would have suggested a defense of lack of criminal responsibility. Cf. *Commonwealth* v. *Walker, supra* at 225 (counsel was informed that defendant had attempted suicide thirteen years earlier, but such incident did not suggest that defendant was suffering from mental illness).

We recognize that, given the unusual and apparently motiveless circumstances of the crime, the defendant's flat affect, the Commonwealth's forensic and eyewitness evidence, and the defendant's history of methamphetamine abuse, another attorney might well have investigated the psychological effects of this type of drug abuse to determine whether it would have had a possible connection with the crime. Research into the effects of long-term methamphetamine abuse would presumably have revealed the extant DSM chapter on amphetamine-induced disorders, including amphetamine-induced psychotic disorder with hallucinations,[10] as well as academic literature on the spontaneous recurrence of methamphetamine-induced psychosis. In light of the strong evidence against him, establishing that the defendant was suffering from methamphetamine-induced psychosis at the time of the stabbing might have been a more powerful defense.

However, in the circumstances here, particularly where trial counsel was not on notice of the defendant's belatedly-asserted prior psychotic episodes and hallucinations, she was not under a constitutional duty to undertake a supplemental investigation. This is especially so given the limited prevalence of methamphetamine use in the Commonwealth in the early 2000s, and the attendant limited exposure of attorneys to methamphetamine-related crimes at that time. Trial counsel testified at the hearing on the second motion for a new trial that, at the time of trial preparation, methamphetamine was "not something that was common yet to our area." Presskreischer, the psychologist, who opined that the defendant was "most likely"[11] suffering from a

---

[10]The DSM chapter available, however, would not have included the diagnosis of spontaneous recurrence of methamphetamine-induced psychosis, the diagnosis that the defendant's expert proffered at the motion for new trial hearing in 2012 to characterize the defendant's mental state at the time of the stabbing, over a decade earlier.

[11]See footnote 7, *supra*.

spontaneous recurrence of methamphetamine-induced psychosis, acknowledged that she had no professional experience with psychosis induced by methamphetamine in particular, since that drug is not as common in the "mid-Atlantic States" as it is in other parts of the country. Indeed, a 2001 report on drug prevalence in the Commonwealth notes that, at the time,

> "[m]ethamphetamine [was] available in small quantities in Massachusetts, but the drug [was] not a significant threat to users or society. Some reporting occasionally suggest[ed] that methamphetamine might be growing in popularity in New England, but the region [had] yet to see a widespread increase in trafficking, distribution, or use. Methamphetamine production occur[ed] in Massachusetts on only a very small scale."

National Drug Intelligence Center, Massachusetts Drug Threat Assessment at 32 (2001).

We discern no error in the judge's determination that the defendant did not demonstrate that facts known or accessible to trial counsel would have put her on notice of a potential mental health defense. Nor do we discern error in his conclusion that trial counsel's failure to investigate a mental health defense did not fall below constitutional standards of competency. Accordingly, because the defendant was not deprived of the effective assistance of counsel, the motion for a new trial properly was denied.

f. *Relief under G. L. c. 278, § 33E.* We have conducted plenary review of the entire record pursuant to our obligation under G. L. c. 278, § 33E. We are satisfied that the defendant did not receive ineffective assistance of counsel and that he was afforded a fair trial. The extraordinary remedy of relief under G. L. c. 278, § 33E, is not warranted in the circumstances of this case, and therefore, we decline to disturb the jury's verdict.

*Judgment affirmed.*

*Orders denying motions for a new trial affirmed.*