NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-10342

COMMONWEALTH  vs.  JIMMY ALCIDE.


Middlesex.      March 6, 2015. - July 13, 2015.

Present:  Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide.  Constitutional Law, Assistance of counsel.  Practice, Criminal, Capital case, Assistance of counsel, Identification of defendant in courtroom.  Identification. Evidence, Third-party culprit, Identification.


Indictment found and returned in the Superior Court Department on September 21, 2006.

The case was tried before S. Jane Haggerty, J., and a motion for a new trial, filed on October 26, 2011, was heard by her.


Matthew A. Kamholtz for the defendant.
Kevin J. Curtin, Assistant District Attorney, for the Commonwealth.


LENK, J.  Sharif Shaheed was shot and killed in the aftermath of an argument between two groups of friends outside a Lowell pub.  The defendant, charged with Shaheed's murder, posited at trial that a third party had been the shooter.  A

Superior Court jury returned a conviction of murder in the first degree on a theory of deliberate premeditation. The defendant filed a motion for a new trial, asserting, among other things, that his trial counsel provided constitutionally ineffective assistance. The motion was denied by the judge who had presided at trial. Before us is a consolidated appeal from the defendant's conviction and from the denial of his motion for a new trial.

There is no dispute that the defendant's counsel did not prepare for trial in an adequate manner. Among other things, defense counsel did not familiarize himself with the Commonwealth's discovery file, did not examine the physical evidence collected by police, did not conduct any independent investigation of the case, and did not consider seeking exclusion of any of the Commonwealth's evidence. Because of counsel's inadequate preparation, significant pieces of evidence supporting a third-party culprit defense were not introduced at trial. In addition, two in-court identifications of the defendant were admitted that, if objected to, could have been excluded. Although the case against the defendant was a strong one, it was not overwhelming, and we are persuaded that "better work might have accomplished something material for the defense." Commonwealth v. Bell, 460 Mass. 294, 303 (2011), quoting Commonwealth v. Johnson, 435 Mass. 113, 123 (2001). In

essence, the defense available to the defendant was aired so inadequately at trial as to create a substantial likelihood of a miscarriage of justice.  Accordingly, we vacate the defendant's conviction and remand for a new trial.

1.  Background.  a.  Shooting and trial.  The evidence at trial centered on an incident that occurred outside a pub in Lowell one night in July, 2006.[1]

Two separate groups of friends visited the pub that night. One group included the victim; his fiancée, Arlene Cruz; his cousin, Keash Hardin; and two of their friends, Luis Parella and

---

[1] For ease of reference, we provide a nearly-complete list of the individuals involved in this case.

Friends and relatives of the victim:

    Arlene Cruz, the victim's fiancée;
    Keash Hardin, the victim's cousin;
    Luis Parella, known as "Orel";
    Tammi, last name unknown;
    Leslie Berube; and
    Benjamin Jones.

Friends and relatives of the defendant:
    Oriol Kedgy Dor, known as "Kedgy";
    Estevenson Etienne, known as "Smoke";
    Fritzgerald St. Preux, known as "Spike";
    Robenson Brinville, known as "Son-Son"; and
    Jimmy Semextant, known as "Big Jimmy."

And other friends and neighbors of Dor:

    Hipolita Gabin, known as "Josie," Dor's girl friend;
    Crispina Mangual, a friend of Dor;
    Sanyph Pierre-Louis, Mangual's boy friend;
    Heidi McLean, Dor's neighbor; and
    Stephanie McLean, Heidi McLean's sister.

a woman named Tammi.  This group was planning to attend a birthday party at a house located across the street from the pub.  Other partygoers, including Leslie Berube and Benjamin Jones, witnessed the victim's killing from the area of that house.

The other, larger group included the defendant; five of his friends:  Oriol Kedgy Dor, Estevenson Etienne, Fritzgerald St. Preux, Robenson Brinville, and Jimmy Semextant; and at least four unidentified individuals, who met with Dor in Boston that day and followed him back to Lowell.

The group that included the victim entered the pub briefly. So did several members of the group that included the defendant. The rest of the defendant's group remained outside, near the pub door.  All of the individuals who had gone into the pub trickled back out, beginning with the victim's group.  When the victim's group was again outside, by the door, and as the remaining members of the defendant's group were exiting, the two groups began arguing.  Dor asked, "Who's Keash?" or "Are you Keash?" or words to that effect.  Hardin, the victim's cousin (who was, in fact, Keash), answered that he was not.  The victim then asked, according to Hardin's testimony, "If it was Keash, what would have happened?"

Semextant, another member of the defendant's group, told Hardin and the victim not to ask any questions.  Hardin

responded by punching Semextant in the face.  The crowd dispersed in a frenzy of running, perhaps (as Hardin testified) after a man standing next to Semextant brandished a gun.[2]

The victim ran away from the pub, and later circled back around toward it.  Semextant was heard calling out, in Haitian Creole, "Shoot!  Shoot!"  Two shots were fired.  One bullet hit the victim in the back of his head, killing him.  Two casings from a .380 automatic caliber weapon were later found at the scene.

The background to this encounter remained murky at trial. Estevenson Etienne (one of the defendant's friends) testified that Dor (another friend) had initiated the visit to the pub because Dor had been "arguing with a guy in there."  According to Etienne, he and Dor knew that "there could be a fight" that night.  Another member of the defendant's group, Fritzgerald St. Preux, said that Dor had traveled to Boston that day in order to "pick up some of" [Dor's] boys."  Both St. Preux and Dor reported that Dor had been in a squabble at the pub on some earlier date, but they both said that that argument was resolved on the spot, and that it involved neither the victim nor Hardin.

The disputed question at trial was whether the defendant was the man who shot the victim.  The murder weapon was not

_____

[2] Hardin ultimately identified that man as the defendant. His identification is discussed infra.

recovered, and no forensic evidence identified the defendant as the shooter. The Commonwealth's case thus relied heavily on the incriminating, and generally consistent, testimony of the defendant's friends, Etienne, St. Preux, Robenson Brinville, and Dor.[3] Close ties were shown between these friends; in particular, Dor's sister and the defendant's brother have two children together. All four of the defendant's friends described statements in which he admitted to shooting the gun. In addition, Etienne testified that he witnessed the defendant lift his hand just before a gunshot rang out and the victim fell; Brinville testified that Semextant had given the defendant a gun earlier that night; and both Etienne and Dor testified that Semextant was addressing the defendant when he said, "Shoot! Shoot!"

Two other eyewitnesses identified the defendant as the gunman: Hardin, and Howard Jewell, who was checking identification documents at the pub door that night. Hardin testified, on direct examination, that he had been unable to

---

[3] Robenson Brinville's and Estevenson Etienne's accounts also were consistent in that they both described Etienne running toward the defendant's vehicle after the shooting, but ultimately deciding not to enter that vehicle. In addition, Fritzgerald St. Preux's account of the defendant's confession, according to which the defendant stated that he had shot the victim "[b]ehind the ears," was consistent with the medical examiner's testimony that the victim had a bullet wound approximately three inches behind his right ear. Jimmy Semextant did not testify.

pick the defendant out of a photographic array approximately one week after the shooting. Subsequently, however, according to Hardin, he saw the defendant's photograph in a newspaper, and he then recognized the defendant as the shooter. Hardin's cross-examination revealed that the newspaper article he had seen was about the shooting, and that the only photograph included in the article was of the defendant. Jewell, on cross-examination, revealed that the background to his identification was similar: at a photographic array conducted soon after the shooting, Jewell picked out the photograph of the defendant, but wrote on the back of the photograph only that the man "[l]ooks familiar. Was there." Jewell also initialed a second photograph in the array, of a person who was never identified. By the time Jewell testified at trial, he had seen a photograph of the defendant in a newspaper. Unlike Hardin, Jewell testified also that, about two weeks before the trial, he was shown a single photograph of the defendant at the district attorney's office.

Benjamin Jones, one of the friends of the victim who witnessed the incident from across the street, did not identify the defendant. Jones stated, however, that the shooter had a "low, tight, bald haircut." According to several witnesses, the defendant had short hair at the time of the shooting, whereas Etienne, St. Preux, and Dor reported that they had each then

worn dreadlocks or braids.[4]  Jones testified also that the shooter ran to a light- or tan-colored Honda Accord.  The defendant's vehicle was a blue-grey Dodge sedan.  The other vehicle in which friends of the defendant traveled that night was a van.

Leslie Berube, another friend of the victim who was standing across the street when the shots were fired, was eighty per cent confident that the defendant's photograph in a photographic array was that of the shooter.  Berube also testified, however, that the shooter dropped a cellular telephone while running; other evidence revealed that the man who dropped his telephone during the incident was Dor, not the defendant.[5]  Berube acknowledged that, immediately after the shooting, her attention was focused on locating her fiancé, Eric Wilkins, who also was at the pub that night.

Finally, evidence was introduced to suggest a consciousness of guilt on the defendant's part.  The defendant changed his telephone number two days after the shooting.  Additionally, an

---

[4] Brinville's and Semextant's hairstyles were not discussed. Hardin testified that the man who asked, "Who's Keash?" -- apparently Oriol Kedgy Dor -- had short hair.

[5] Dor's cellular telephone was recovered approximately thirty feet down the street from where the shooting occurred. St. Preux's testimony indicated that Dor had dropped his telephone before the shots were fired.  This testimony, if accurate, suggested that Dor could have been the shooter only if, after dropping his telephone, he ran back toward the pub.

officer testified to statements that the defendant made to police following his arrest, approximately nine days after the shooting.  While sitting in a police cruiser, after being read the Miranda rights, the defendant was told that he was being charged with murder for a shooting in Lowell.  At first, the defendant responded that he did not know anything about the shooting.  After he was informed that he had been identified as the shooter, the defendant said that he had been in Lowell a week or two earlier, but that nothing had happened.  The defendant initially denied any memory of the names of the friends with whom he had been on that occasion.  He stated also that there had been a "problem" that night, but that he himself had not been involved.[6]

At the close of the Commonwealth's evidence, the defendant moved for a required finding of not guilty.  The judge allowed the motion only as to the theory of extreme atrocity or cruelty, and otherwise denied it.  The defendant did not present evidence.  The theory of the defense was that a third party, probably Dor, had been the shooter.  Defense counsel's closing argument focused on Berube's testimony that the shooter was the same man who had dropped his cellular telephone, namely Dor, and on certain inconsistencies between the versions of events

---

[6] The defendant's conversation with police was not recorded. The jury were instructed in accordance with Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004).

provided by the defendant's friends.  Counsel suggested that Etienne, St. Preux, and Brinville -- who had gone to speak to police of their own volition -- falsely incriminated the defendant, presumably in order to protect Dor.  The prosecutor did not argue the case as a joint venture, and no jury instructions on joint venture were given.  On their fourth day of deliberations, the jury returned a verdict of guilty of murder in the first degree.

b.  <u>Postconviction proceedings</u>.  Represented by new counsel, the defendant filed a motion for a new trial, which we remanded to the Superior Court.  The primary argument made in the motion was that the assistance provided by the defendant's trial attorney was constitutionally ineffective.  The defendant maintained also that the prosecutor erred by eliciting false evidence and by arguing in his closing facts not in evidence.

The defendant's ineffective assistance claim relied on materials from the Commonwealth's pretrial discovery and on an affidavit of his trial counsel.  According to that affidavit, the defendant's trial was counsel's first murder trial.  Counsel was paid approximately $12,000 for his services.  He averred that, at the time of the trial, he was unaware of much of the contents of the Commonwealth's discovery file.  He did not visit the Lowell police department to examine the physical evidence collected in the course of the investigation.  He rarely, if

ever, "engage[d] experts or investigators to assist in the defense." He did "not independently investigate this case and . . . did not attempt to contact and interview any of the witnesses identified in the discovery materials." In addition, it was "not [counsel's] habit to engage in motion practice," including motions to suppress.[7]

The defendant argued that the discovery materials produced to his attorney included potential evidence that would have supported the theory that Dor was the shooter. This evidence included: (a) a description of Dor's clothing on the day of the shooting provided to police by his neighbor, Heidi McLean,[8] coupled with a matching description of the clothing worn by the shooter provided to police by Luis Parella, one of the victim's friends; (b) a statement to police by the same neighbor, Heidi, that she had been told by Hipolita Gabin, Dor's girl friend, that "[Gabin's] man shot somebody"; (c) accounts by Dor's friends and neighbors, contained in police reports and grand jury testimony, about prior incidents at the pub, and about statements made by Dor after those incidents, indicating that Dor intended to harm Hardin and his friends; and (d) information

---

[7] The defendant's trial attorney has since been disbarred. See Matter of Kelly, No. BD-2009-006 (Mar. 22, 2010). The defendant has not suggested that counsel's disbarment was related in any way to the present case.

[8] Because she shares a last name with her sister, Stephanie, we refer to Heidi McLean by her first name.

that police found a nine millimeter bullet while searching Dor's apartment.  The defendant argued also that his attorney should have sought the exclusion of the in-court identifications of the defendant by Hardin and Jewell.

The trial judge did not grant the defendant's request for an evidentiary hearing.  After receiving memoranda and hearing argument, she denied the motion for a new trial in a detailed written decision.  Focusing implicitly on whether trial counsel's performance prejudiced the defendant, the judge concluded, first, that some of the potential testimony on which the defendant relied would not have been admissible, given the restrictions on the admissibility of third-party culprit evidence.  See Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009) (Silva-Santiago).  Other testimony, according to the judge, "suggest[ed] that [Dor] was the shooter."  But the judge concluded, relying on Commonwealth v. O'Laughlin, 446 Mass. 188, 204 (2006), that this evidence was "not 'so overwhelming' to affect the sufficiency of the evidence."  The judge reasoned that any motions to suppress the identifications by Hardin and Jewell would have been denied under the then prevailing case law.  Finally, the judge discerned no impropriety in the evidence presented by the Commonwealth or in the prosecutor's closing argument.  The defendant appealed from

both his conviction and the denial of his motion for a new trial.

2.  Applicable standards.  We focus our analysis on the defendant's primary claim, that he received constitutionally ineffective assistance from his trial counsel.[9]  Ordinarily, a defendant asserting a claim of this kind must show "that 'there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer,' and that, as a result, the defendant was 'likely deprived . . . of an otherwise available, substantial ground of defence.'"  Commonwealth v. Boria, 460 Mass. 249, 252 (2011), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  When an ineffective assistance of counsel claim is made on direct appeal from a conviction of murder in the first degree, however, we apply the standard "more favorable to a defendant" of whether there is a substantial likelihood that a miscarriage of justice occurred.  See Commonwealth v. Marrero, 459 Mass. 235, 244 (2011), citing Commonwealth v. Williams, 453 Mass. 203, 204-205 (2009).  Under this standard, "[i]f we conclude 'that counsel erred by failing to raise a substantial defense, "a new trial is

_____

[9] Because we conclude that the defendant's ineffective assistance of counsel claim warrants a new trial, we need not address his assertions that the prosecutor misstated the evidence and solicited false testimony, other than to note that we find little merit in them.

called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same."'" Commonwealth v. Spray, 467 Mass. 456, 472 (2014), quoting Commonwealth v. Sena, 429 Mass. 590, 595 (1999), S.C., 441 Mass. 822 (2004).

In our review for a substantial likelihood of a miscarriage of justice due to ineffective assistance of counsel, we consider whether the defendant has made "some showing that better work might have accomplished something material for the defense." See Commonwealth v. Bell, 460 Mass. 294, 303 (2011), quoting Commonwealth v. Johnson, 435 Mass. 113, 123 (2001). One type of situation in which such a showing may be made is where counsel neglected "evidence that another person committed the crime," Commonwealth v. Phinney, 446 Mass. 155, 163 (2006), S.C., 448 Mass. 621 (2007), and that evidence, "if developed, might have raised a reasonable doubt about whether the defendant or someone else had killed the victim." Commonwealth v. Farley, 432 Mass. 153, 156 (2000), S.C., 443 Mass. 740, cert denied, 546 U.S. 1035 (2005).

We review a judge's denial of a motion for a new trial for "a significant error of law or other abuse of discretion," granting "special deference to the rulings of a motion judge who was also the trial judge." Commonwealth v. Forte, 469 Mass. 469, 488 (2014), quoting Commonwealth v. Grace, 397 Mass. 303,

307 (1986).  When we review such a decision in the context of an appeal from a conviction of murder in the first degree, the defendant nevertheless "has the benefit of our independent review, pursuant to G. L. c. 278, § 33E . . . of the entire record."  Commonwealth v. Carter, 423 Mass. 506, 513 (1996).

In the current case, we cannot defer in the usual manner to the trial judge's assessment of the defendant's claims against the backdrop of the evidence heard at trial.  Throughout her decision denying the defendant's motion for a new trial, and intertwined with her discussion whether the information offered by the defendant would have been admissible as third-party culprit evidence, the judge indicated that she was guided by the standard described in Commonwealth v. O'Laughlin, 446 Mass. at 204.[10]  The defendant in that case was convicted of burglary and

---

[10] Although the judge correctly recited the requirements that third-party culprit evidence must satisfy, see Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009), her analysis wove into those requirements the inapt standard of Commonwealth v. O'Laughlin, 446 Mass. 188, 204 (2006).  The judge wrote, for instance, that contradictions between the third-party culprit evidence and the Commonwealth's evidence at trial were "not so 'powerful' or 'overwhelming' to overcome the sufficiency of the Commonwealth's case," and that a proffered statement by Heidi, Dor's neighbor, was "not 'so overwhelming' to affect the sufficiency of the evidence establishing that the defendant was the shooter."  In the concluding portion of her discussion of the third-party culprit evidence, the judge stated that "the fact that the defendant has presented evidence that he did not [commit the crime] does not affect the sufficiency of the evidence," and that the third-party culprit evidence was not "overwhelming" but rather "simply tended to contradict the Commonwealth's evidence."  As the judge has retired, the

other offenses.  See id. at 189.  Circumstantial evidence was presented "of motive, opportunity, and means, as well as consciousness of guilt."  Id. at 199.  The defendant argued that the evidence was insufficient to support the verdict, relying in part on evidence suggesting that a third party had been the culprit.  See id. at 203.  We held, however, that, "if the Commonwealth has presented sufficient evidence that the defendant committed the crime, the fact that the defendant has presented evidence that he did not does not affect the sufficiency of the evidence unless the contrary evidence is so overwhelming that no rational jury could conclude that the defendant was guilty."  Id. at 204.

The defendant in the current case presents a claim of a different nature, namely that his trial counsel rendered ineffective assistance.  The defendant does not assert that the Commonwealth's evidence at trial was insufficient to support the verdict, or even that the evidence would have been insufficient if the defendant had received effective assistance from his attorney.  The standards that govern the defendant's ineffective assistance claim do not demand evidence "so overwhelming that no rational jury could conclude that the defendant was guilty."  Id.  Because the defendant's claim was not assessed by the judge

defendant's motion for a new trial cannot be remanded for reconsideration in light of the applicable standards.

against the appropriate standards, we are constrained to rest our analysis on our independent review of the record.

3. <u>Analysis</u>. Our examination of the defendant's ineffective assistance of counsel claim, in light of the foregoing principles, proceeds in three parts. At the outset, we comment on the practices of the defendant's attorney in preparation for trial. We then scrutinize the missteps that, as a result of counsel's practices, occurred at trial. With those foundations in hand, we evaluate whether there is a substantial likelihood that a miscarriage of justice has occurred.

a. <u>Counsel's practices in preparation for trial</u>. We begin by stating plainly what was implicit in the judge's decision denying the motion for a new trial: the practices of the defendant's counsel in preparing for trial, as counsel has described them, were unacceptably remiss. Appropriately, the Commonwealth has so conceded. We do not undertake here an in-depth analysis of the professional obligations of defense attorneys. Suffice it to say that a reasonably competent attorney representing the defendant would have been expected to become familiar with the discovery materials produced by the Commonwealth; to examine the physical evidence available for inspection at the police station; to independently investigate at least certain aspects of the case, if necessary drawing on experts or investigators for help; and, barring strategic

reasons to the contrary, to file any motions to suppress evidence reasonably likely to succeed. See, e.g., Committee for Public Counsel Services, Assigned Counsel Manual, c. 4, at 10-13 (Oct. 2011). The defendant's attorney, who failed to perform any of these tasks, did not arrive at trial prepared to provide the quality of assistance that would be expected of a reasonably effective attorney. See Commonwealth v. Saferian, 366 Mass. at 97 ("dependence on improvised cross-examination alone, even if it will surely be of virtuosic quality, is not to be recommended").

b. Specific lapses by counsel at trial. A question more crucial to our analysis is whether defense counsel's careless practices compromised the defense ultimately presented at trial. For the reasons we explain, we conclude that the defendant "was denied a fair trial due to trial counsel's . . . failure to investigate and develop the evidence which could have supported the defendant's defense," Commonwealth v. Farley, 432 Mass. at 157, coupled with counsel's failure to challenge important inculpatory evidence of questionable reliability.

i. Exculpatory evidence not presented. The defense offered at trial, that a third party had been the shooter, relied wholly on portions of the evidence put on by the Commonwealth. Predominantly, the defense focused on Berube's testimony that the man who shot the victim was the same man who

dropped his cellular telephone (i.e., Dor).  Standing in isolation, this piece of testimony was vulnerable to the suggestion, made by the prosecutor in closing, that Berube -- who later identified the defendant from a photographic array with eighty per cent assurance -- was merely confused and distracted immediately after the shooting.  Because defense counsel neglected to explore the potential for a third-party culprit defense in advance of trial, he did not identify, investigate, assemble, and present additional evidence that would have buttressed the theory that Dor was the shooter.  That evidence, "if developed, might have raised a reasonable doubt about whether the defendant or someone else had killed the victim."  Commonwealth v. Farley, 432 Mass. at 156.  See Commonwealth v. Haggerty, 400 Mass. 437, 441 (1987) (new trial warranted by counsel's "failure to investigate fully and pursue" defense raised at trial).  Two pieces of information provided in the Commonwealth's discovery, in particular, could have added heft to the defense's hypothesis that Dor was the shooter.

The first of these was a description of the shooter provided to police by Parella, one of the victim's friends.  Parella stated, first, that the shooter was wearing a red T-shirt, with gold print, and blue jeans.  Dor, according to his neighbor, Heidi, was wearing a red shirt and blue jeans on the

day of the shooting.[11]  Parella also stated that the shooter had

"short dread locks."  This description fit Dor's hair, not the

defendant's; while the defendant's haircut at the time of the

shooting was reportedly a "Caesar" or a "fuzzy head,"  Dor

testified that, at that time, he had braids that "were hanging

down," but "not long."[12]

The second piece of information that could have fortified

the third-party defense was that, also according to Heidi, Gabin

(Dor's girl friend) said after the shooting that "[her] man shot

somebody."  Whether or not Gabin herself might have been called

to testify at trial, a reasonably effective attorney would have

endeavored to call Heidi to recount Gabin's statement.  Like all

third-party culprit evidence, this testimony would have been

admissible if the judge determined that it had "a rational

---

[11] The witnesses who knew the defendant did not describe his clothing on the day of the shooting.  Benjamin Jones testified that the shooter wore a light colored shirt, probably white. Hardin thought that the shooter's shirt had been tan.  Leslie Berube's recollection was that the shooter was wearing a hooded sweatshirt.

[12] Luis Parella also told police that he had been chased by a different man, who had short hair and was wearing a red and white striped shirt.  While chasing Parella, that man said, "Why you running, why you running?"  The judge, who focused on this portion of Parella's statement, apparently concluded that Parella's account would have been undermined by the testimony of Arlene Cruz, the victim's fiancée, that a man who asked her, "Why are you running now?" was not the defendant.  In the stampede that followed the shooting, however, Cruz and Parella may have encountered different men asking similar questions, they both may have encountered a man who was not the defendant, or Cruz may have been mistaken.

tendency to prove the issue the defense raises" and was not "too remote or speculative." Silva-Santiago, supra at 801, quoting Commonwealth v. Rosa, 422 Mass. 18, 22 (1996). In addition, because Gabin's statement would have been hearsay, its admissibility would have turned on the judge's assessment whether it was "otherwise relevant," whether it would "tend to prejudice or confuse the jury," and whether there were "other 'substantial connecting links' to the crime." Silva-Santiago, supra, quoting Commonwealth v. Rice, 441 Mass. 291, 305 (2004).[13]

Here, there were other links between Dor and the shooting, namely Berube's testimony that the shooter was the man who dropped his cellular telephone and Parella's description of the shooter, coupled with Heidi's description of Dor's clothing. And considering that Berube's testimony already implicated Dor, it is difficult to say that Gabin's statement to the same effect would have confused the jury. We have stressed that "[i]f the evidence is 'of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'" Silva-Santiago, supra, quoting Commonwealth v. Conkey, 443 Mass. 60, 66 (2004). Accordingly, we assume, for purposes of our analysis of the defendant's ineffective

---

[13] A more complete examination of these factors might have been made possible by an evidentiary hearing on the defendant's motion for a new trial.

assistance claim,[14] that Heidi would have been permitted to testify to Gabin's statement incriminating Dor. Cf. Commonwealth v. Phinney, 446 Mass. at 163-164 (concluding that third-party culprit evidence not offered by trial counsel would have been admitted from judge's treatment of other such evidence).[15]

Other potential testimony identified by the defendant, while less directly probative of the third-party culprit defense, might have enhanced it by establishing that Dor had both a motive and an intent to engage in violence toward the victim's group of friends. This testimony could have been provided by Crispina Mangual, Sanyph Pierre-Louis (Mangual's boy friend), and Stephanie McLean (Heidi's sister), all friends and neighbors of Dor. According to their pretrial statements, these

---

[14] Our analysis focuses on the question whether, because of constitutionally ineffective assistance of counsel, the defendant is entitled to a new trial. Nothing said here is concerned with, and we accordingly do not address, how evidentiary issues, such as the admission of particular third-party culprit evidence or the exclusion of certain eyewitness identification testimony, should be resolved at a new trial. Questions concerning the admissibility of evidence, resting largely within the trial judge's sound discretion, are to be addressed on retrial in the usual course.

[15] Indeed, the judge below, while concluding that other information likely would not have been admitted as third-party culprit evidence, stated that "Heidi's statement to the police suggests that [Dor] was the shooter," and dismissed the importance of this potential testimony only for the misplaced reason that it was "not 'so overwhelming' to affect the sufficiency of the evidence."

individuals could have testified that, a week or two before the shooting, Hardin and an unidentified man harassed Gabin, Dor's girl friend, while Dor and St. Preux were outside the same pub smoking.[16] Dor was enraged, and he told his friends, "They're lucky I didn't have a piece on me." Closer in time to the shooting, the same friends and neighbors heard from Dor and Gabin that Dor intended to go back to the pub to show "[t]hese niggas from Lowell . . . who's a gangster" and to "shoot [Hardin]."

At least some of this information likely would have been admissible as third-party culprit evidence, namely evidence that tended to show that Dor "had the motive, intent, and opportunity to commit [the crime]." Silva-Santiago, supra at 800, quoting Commonwealth v. Lawrence, 404 Mass. 378, 387 (1989). Like Gabin's statement that "her man shot somebody," this information was supported by additional "connecting links" between Dor and the crime, and it is difficult to say that this information would have confused the jury. See Silva-Santiago, supra at 801, quoting Commonwealth v. Rice, 441 Mass. at 305. Moreover, the observations of Dor's friends and neighbors about earlier goings on at the pub would not have been hearsay.

---

[16] Hardin was not questioned about this incident at trial, presumably because defense counsel was not aware of it.

The potential testimony of Dor's friends and neighbors would not have been contrary to the evidence, presented by the Commonwealth, that Dor and his friends were at the pub because (in Etienne's words) Dor had been "arguing with a guy in there," knowing that "there could be a fight." Still, evidence of Dor's personal involvement in earlier hostilities, and of his personal desire for revenge, could have given form to the other indications that Dor was the shooter, by suggesting why Dor himself might have taken out a gun and fired it. By contrast, the only explanation offered at trial as to why the defendant might have shot the victim was that the defendant was part of Dor's group and was at the pub to support Dor's efforts. Especially given that the case was not put to the jury on a joint venture theory, this final set of information, unheeded by defense counsel, would have bolstered the prospect of a successful third-party culprit defense.[17]

---

[17] By contrast, we agree with the judge that information about yet another confrontation at the pub, approximately three weeks before the shooting, probably would not have been admitted, as that incident did not involve Dor. We agree also that the defendant's ineffective assistance claim gains little support from defense counsel's failure to make use of information that police located a nine millimeter bullet in Dor's apartment. The defendant argues that this information would have shown, contrary to Dor's testimony, that Dor was familiar with weapons. Apart from serious questions about the admissibility of this information, however, see Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012), we are not convinced that an effective attorney would have sought to introduce it in evidence. The defendant has not disputed the Commonwealth's

ii. <u>Inculpatory evidence not challenged</u>. The other side of the evidentiary ledger, namely the evidence of the defendant's guilt, also could have looked different if the defendant had received reasonably effective assistance from his counsel. The key issue at trial was the identity of the shooter. Dor, Etienne, St. Preux, and Brinville all provided incriminating testimony on this issue, describing either the shooting itself or subsequent confessions by the defendant. The defense was unlikely to succeed unless there were reason to think that these witnesses were lying to protect Dor. The challenge of generating such a doubt was made all the more difficult by the identifications of the defendant as the gunman by Jewell and Hardin, who knew neither Dor nor the defendant.[18] Exclusion of these identifications would have made a real difference, therefore, to the defense's prospects.

_____

assertion, supported by an affidavit of a firearms examiner introduced below, that a nine millimeter firearm could not fire .380 automatic caliber bullets such as those that left the casings found at the scene of the shooting. Evidence that Dor had access to a nine millimeter firearm might have harmed the defense, therefore, by suggesting that, if Dor had been the culprit, he would not have used .380 automatic caliber bullets.

[18] If Howard Jewell's and Hardin's identifications were excluded, the remaining identification evidence by strangers to Dor and the defendant would have been the testimony of Berube, which pointed at Dor as well, and that of Jones, who described only the shooter's hairstyle and the vehicle to which he ran (which, as described by Jones, resembled the defendant's vehicle but was not identical to it).

These identifications suffered from serious weaknesses. At photographic arrays conducted soon after the shooting, both Hardin and Jewell failed to pick out the defendant as the shooter. Jewell, who thought that the defendant looked "familiar" and had been at the scene (a point not disputed), also marked his initials on another photograph of an unidentified individual. By the time of the trial, Hardin and Jewell each had seen the defendant's photograph in a newspaper article about the shooting. Jewell testified also that, at the district attorney's office, about two weeks before trial, he was shown a photograph of the defendant unaccompanied by other photographs. In court, both Hardin and Jewell identified the defendant as the gunman without objection.[19]

We recently have held that, in the future, in-court identifications generally will not be permitted where a witness has participated in a pretrial identification procedure that "produced something less than an unequivocal positive identification." See Commonwealth v. Collins, 470 Mass. 255,

---

[19] Counsel's failure to challenge these identifications apparently resulted from a combination of his inadequate trial preparation and his policy against motion practice. The photographic arrays administered to Hardin and Jewell were included in the Commonwealth's discovery, as was the fact that Hardin saw a photograph of the defendant in a newspaper. The fact of Jewell's encounter(s) with the defendant after participating in a photographic array was not revealed in the Commonwealth's discovery, although it may have been disclosed orally sometime before trial.

262 (2014). Our most up-to-date jurisprudence is not the applicable standard, however, because an attorney "[i]s not ineffective for failing to make an objection that would have been futile under the prevailing case law." Id. at 261, citing Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983). See Commonwealth v. Boria, 460 Mass. 249, 253 (2011); Commonwealth v. Holliday, 450 Mass. 794, 813 (2008). We must therefore inquire whether, under the prevailing law, it would have been "futile" for the defendant's attorney to have objected to Hardin's and Jewell's in-court identifications. In the circumstances, we cannot conclude that such an objection would have been futile.[20]

To begin with, the law has long been settled that "an in-court identification is excluded if it is tainted by an out-of-court confrontation arranged by the Commonwealth that is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Commonwealth v. Bol Choeurn, 446 Mass. 510, 520 (2006), overruled on another ground by Commonwealth v. Crayton, 470 Mass. 228 (2014), quoting Simmons v. United States, 390 U.S. 377, 384 (1968). Jewell's in-court identification could have been challenged as "tainted" in this sense, given his testimony that, before trial, he was

---

[20] See note 14, supra.

shown a single photograph of the defendant at the district attorney's office.[21] The defendant's attorney presented no such claim. When, at a sidebar conference, the judge offered to permit a voir dire of Jewell, so that defense counsel could inquire further into the circumstances of Jewell's identification, defense counsel declined repeatedly, stating that he would "let it go." The Commonwealth has not identified a reasonable strategic reason that might have supported this decision, and none is suggested in trial counsel's affidavit. Cf. Commonwealth v. Dougan, 377 Mass. 303, 316-317 (1979), citing Commonwealth v. Dickerson, 372 Mass. 783, 789 (1977), abrogated on other grounds by Commonwealth v. Paulding, 438 Mass. 1 (2002) (stating that "full exploration of the circumstances surrounding eyewitness identification is necessary to ensure a fair trial"). There is thus no reason to conclude that a motion to exclude Jewell's identification would have been futile.

In addition, the identifications made by both Jewell and Hardin could have been challenged under our common-law rule that, "in some circumstances[,] an identification that has been tainted, but not by the government, may become so unreliable

---

[21] In the proceedings on the defendant's motion for a new trial, the Commonwealth submitted an affidavit of the trial prosecutor, who stated that neither he nor his cocounsel showed Jewell a photograph of the defendant. The motion judge did not hear oral testimony or make findings about this matter.

that its introduction in[] evidence is unfair."  Commonwealth v.

Odware, 429 Mass. 231, 236 (1999).  See Commonwealth v. Jules,

464 Mass. 478, 490 (2013); Commonwealth v. Walker, 460 Mass.

590, 605 (2011); Commonwealth v. Sylvia, 456 Mass. 182, 190

(2010); Commonwealth v. Bly, 448 Mass. 473, 494 (2007);

Commonwealth v. Castro, 438 Mass. 160, 171 (2002); Commonwealth

v. Horton, 434 Mass. 823, 835 (2001); Commonwealth v. Jones, 423

Mass. 99, 103-105 (1996).  Cf. Commonwealth v. Dougan, 377 Mass.

at 317-318, and cases cited (trial judge may grant requests for

"in-court lineup" or "photographic spread" and may "seat [the

defendant] among the spectators at trial" to increase

reliability of in-court identification).  A judge's authority to

exclude severely unreliable identification testimony is closely

related to his or her more general "discretion to exclude

evidence that is more prejudicial than probative."  Commonwealth

v. Jones, supra at 107.  See Commonwealth v. Bonds, 445 Mass.

821, 831 (2006), and cases cited; Mass. G. Evid. § 403 (2015).

We have stated that "a casual confrontation in neutral

surroundings, such as those that occur through the media"

ordinarily does not warrant the exclusion of identification

testimony.  See Commonwealth v. Jones, 423 Mass. at 109-110,

citing Commonwealth v. Colon-Cruz, 408 Mass. 533, 542 (1990).

See also Commonwealth v. Jules, 464 Mass. at 490; Commonwealth

v. Sylvia, 456 Mass. at 190; Commonwealth v. Bly, 448 Mass. at

495. But the cases in which we have so stated did not involve the additional problem with the reliability of the identifications presented here -- namely that, before seeing the defendant's photograph in the media, Jewell and Hardin failed to pick him out as the gunman in photographic arrays.[22] This factor would have provided further support for an argument that Jewell's and Hardin's identifications of the defendant were not, in fact, based on their recollections of the night of the shooting. Given this additional reason to consider the identifications "so unreliable as to require exclusion," Commonwealth v. Jones, supra at 108, we cannot conclude that efforts to exclude them would have been futile.

c. Review for a substantial likelihood of a miscarriage of justice. The upshot of the foregoing discussion is that the defendant's counsel did not seek to introduce certain readily available pieces of evidence supporting the defendant's third-party culprit defense; and failed, too, to challenge the

---

[22] Commonwealth v. Colon-Cruz, 408 Mass. 533 (1990), is not to the contrary even though it, too, involved an unsuccessful pretrial photographic array. The array administered there did not include a photograph of the defendant; the in-court identification was not solicited by the prosecution, id. at 541-542,; and that case predated Commonwealth v. Jones, 423 Mass. 99 (1996), in which we departed from the jurisprudence of the United States Supreme Court by "rel[ying] on common-law principles of fairness to suppress an identification . . . even where the circumstances did not result from improper police activity." See Commonwealth v. Crayton, 470 Mass. 228, 235 (2014), comparing Commonwealth v. Jones, supra at 109, with Perry v. New Hampshire, 132 S. Ct. 716, 720-721 (2012).

admission of potentially excludable eyewitness testimony.  We are persuaded that the cumulative effect of these errors created a substantial likelihood of a miscarriage of justice.[23]

"This is not a case where 'arguably reasoned tactical or strategic judgments . . . are called into question . . . .' Rather, in this case, defense counsel did not investigate the only realistic defense the defendant had to the charge of murder in the first degree."  Commonwealth v. Haggerty, 400 Mass. at 441, quoting Commonwealth v. Rondeau, 378 Mass. 408, 413 (1979). This also is not a case in which the defendant failed "to point out . . . some issue of fact . . . that could have been but was not exploited . . . in the original proceedings."  Commonwealth

---

[23] As noted earlier, the rules announced in our recent decisions concerning certain eyewitness testimony are prospective only, see Commonwealth v. Collins, 470 Mass. 255, 265 (2014), and Commonwealth v. Crayton, 470 Mass. at 241-242, and we do not apply them in considering whether trial counsel here rendered ineffective assistance.  Nonetheless, we are not unmindful of the concerns that prompted those rules.  Cf. Commonwealth v. Pring-Wilson, 448 Mass. 718, 736-737 (2007) (grant of new trial in light of concerns underlying subsequent prospective doctrine was not abuse of discretion); Commonwealth v. Phinney, 446 Mass. 155, 166-167 (2006), S.C., 448 Mass. 621 (2007).  In those recent decisions, we recognized that "[t]he danger of unfairness arising from an in-court showup . . . is considerable" where, among other circumstances, a pretrial identification procedure produced less than an unequivocal positive identification.  See Commonwealth v. Collins, supra at 262.  See also Commonwealth v. Crayton, supra at 238-242.  Given this, when discharging our duty under G. L. c. 278, § 33E, and assessing whether, upon plenary review that takes into account the totality of the circumstances, relief may be warranted "for any . . . reason that justice may require," id., we need not blind ourselves to the unfairness that may be created by in-court show-up identifications in certain circumstances.

v. <u>Saferian</u>, 366 Mass. at 98. Instead, for the reasons described <u>supra</u>, the substandard assistance provided by defense counsel deprived the defendant of an opportunity to put a reasonable version of the defense available to him before the jury. See <u>Commonwealth</u> v. <u>Phinney</u>, 446 Mass. at 157, 164 (affirming grant of new trial for failure to develop third-party culprit defense where evidence of two other third-party culprits had been presented at trial).

Counsel's failure even to look into the Commonwealth's discovery required him to rely almost entirely, in support of the third-party culprit defense, on a portion of the testimony of a prosecution witness, Berube. On the evidence presented at trial, it would not have been difficult for the jury to discard Berube's testimony as the product of her confusion in the wake of the shooting. With the benefit of reasonably effective assistance from defense counsel, on the other hand, the defense could have combined Berube's testimony that the shooter was the man who had dropped his cellular telephone with Parella's description of the shooter, which matched a description fitting Dor and not the defendant; with Gabin's reported statement that her boy friend, Dor, shot somebody; and with accounts from Dor's friends and neighbors indicating that, because of a previous incident at the pub, Dor intended to hurt the victim's group of friends. These multiple suggestions of Dor's guilt, from

different sources, would have been harder to dismiss as incidental errors. Their combined force would have made exponentially stronger the argument that reasonable doubt of the defendant's guilt remained. On the other side of the scale, counsel's failure to challenge the identification testimony of Jewell and Hardin seriously compromised the viability of the hypothesis, upon which a successful defense depended, that Dor, Etienne, St. Preux, and Brinville were lying on Dor's behalf. "[B]etter work" thus might have accomplished "something material for the defense." Commonwealth v. Bell, 460 Mass. 294, 303 (2011), quoting Commonwealth v. Johnson, 435 Mass. 113, 123 (2001).

The case against the defendant would have been powerful in any scenario. "But the point is that the defendant was denied the opportunity to present the evidence . . . to the jury so they could weigh it against the testimony concerning the defendant's [guilt]." Commonwealth v. Phinney, 446 Mass. at 167, citing Commonwealth v. Miller, 435 Mass. 274, 279 (2001). Defense counsel's seriatim inexcusable failures to familiarize himself with discovery materials, to conduct an independent investigation, to present available third-party culprit evidence, and to challenge vulnerable identification testimony were laden with consequence. The evidentiary picture put to the jury in the wake of counsel's desultory efforts was sufficiently

different from what it would have been under the direction of a reasonably effective attorney that we cannot say with the requisite substantial confidence that, in the absence of counsel's errors, the verdict would have been the same. See Commonwealth v. Spray, 467 Mass. 456, 472 (2014), quoting Commonwealth v. Sena, 429 Mass. 590, 595 (2004). Otherwise put, it would be unfair for the defendant's conviction of murder in the first degree to rest on a trial at which his defense was presented so poorly and incompletely. See Commonwealth v. Mahar, 442 Mass. 11, 20-21 (2004) (Sosman, J., concurring), quoting Strickland v. Washington, 466 U.S. 668, 689 (1984) ("the purpose of the effective assistance guarantee of the Sixth Amendment is . . . to ensure that criminal defendants receive a fair trial").

4. Conclusion. The judgment of conviction is vacated and set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.